**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION**
Case No. 00-6139-CIV-Ferguson
Magistrate Judge Snow

AILENE COLINI,

        Plaintiff,

  v.

HUMANA INC.,

        Defendant.

_____/



# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
# MOTION TO DISMISS PLAINTIFF'S COMPLAINT

DC1:423372. 1



# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................. 2

Background and Summary of Argument ................................................................ 4

Argument ............................................................................................................... 7

I.    Ms. Colini's Claims Are Barred in Their Entirety by the Extensive Array of State and Federal Laws and Regulations that Specifically Permit and Regulate the Challenged Features of Managed Care. ............................................... 9

    A.    The Comprehensive State and Federal Laws that Permit and Regulate the Very Cost-Containment Practices at Issue Preclude the Finding of Concealment Essential to Ms. Colini's Claims................................ 9

        1.    The Practices Ms. Colini Attacks Are Permitted And Regulated By A Complex Web Of State And Federal Law. .................................. 7

            a.    State Legal And Regulatory Regimes. ....................... 9

            b.    Federal Law.......................................................... 11

        2.    State And Federal Recognition, And Regulation, Of The Challenged Cost-Containment Practices, Together With State Laws Requiring Regulatory Approval Of The Challenged "Disclosure Documents," Preclude Any Finding Of Concealment As A Matter Of Law. ..................................... 12

    B.    Ms. Colini's Request for Monetary Relief is Barred by the Filed-Rate Doctrine.................................................................................... 14

    C.    The Doctrine of Burford Abstention Bars Ms. Colini's Request for Injunctive Relief............................................................................ 18

II.    Ms. Colini's RICO Claim Is Meritless....................................................... 19

    A.    As a Matter of Law, Ms. Colini's Theory of a Loss in the "Value" of Her Insurance Coverage Does Not Qualify as RICO Injury........................... 20

    B.    Ms. Colini's Failure to Exercise Her Option to Change Health Plans Precludes the Elements of Materiality, Reliance, and Causation Required to Sustain Her RICO Claim........................................... 25

    C.    Ms. Colini Has Failed Properly to Plead the Existence of a RICO Enterprise. ................................................................................. 28

    D.    ms. Colini fails to allege that she has been injured by reason of defendant's use or investment of racketeering income. ................... 29

III.    Ms. Colini's Complaint Fails to Allege a Violation of ERISA................... 30

    A.    Ms. Colini's Failure to Exhaust Available Administrative Remedies Requires Dismissal of All of Her ERISA Counts. ......................... 30

# TABLE OF CONTENTS
## (continued)

Page

B.  Ms. Colini's Claim for Breach of Statutory Disclosure Responsibilities Is Without any Basis Under ERISA............................................................. 31

C.  Ms. Colini's Claims for Breach of Fiduciary Duty Under Are Fatally Defective. ........................................................................................................ 34

   1.  Ms. Colini's Claim In Count III That Operation Of A Managed Care Plan Is Unlawful Per Se Is Baseless. ........................................... 34

   2.  Even If Recharacterized As A Nondisclosure Claim, Ms. Colini's ERISA Claim For Breach Of Fiduciary Duty Must Be Dismissed. .......................................................................................... 38

D.  The Relief Ms. Colini Requests To Redress the Asserted Breaches of Fiduciary Duty Is not Available Under ERISA. .............................................. 40

   1.  The Relief Ms. Colini Seeks Is Not Authorized. ................................. 40

   2.  The Relief Ms. Colini Requests For Her Fiduciary Claims Is Not "Equitable," And Thus Is Not Permitted...................................... 44

E.  Ms. Colini's Erisa Claim for Benefits Is Meritless as Well........................... 45

Conclusion ....................................................................................................................... 47

## INTRODUCTION

This is not a lawsuit. A "lawsuit" is a "proceeding in a court of justice" in which an allegedly injured "individual pursues that remedy . . . which the law affords him." *Weston v. Charleston,* 27 U.S. (2 Pet.) 449, 464 (1829) (Marshall, C.J.). But plaintiff's complaint contains no allegation of injury. It does not allege that the defendant – Humana Inc. ("Humana") – *ever* denied the plaintiff coverage for any medically necessary procedure or otherwise breached a statutory duty in a way that injured her. Further, the complaint does not claim any legal remedy to which the plaintiff is supposedly entitled.

What the complaint does assert is that Ailene Colini is dissatisfied with the decisions by Congress and state legislatures to encourage the growth of managed care health plans as a way to maintain employer-sponsored health care in an era of spiraling health care costs,[1] and the resulting fact that her employer offers health care benefits exclusively through managed care organizations. Her displeasure is founded on the hypothesis that health maintenance organizations ("HMOs") and other managed care organizations have an incentive to "undertreat" their patients due, in part, to compensation arrangements under which physicians assume part of the HMOs' financial risks. But this supposition suffers from an obvious logical flaw: It ignores the fact that, if HMO members become more seriously ill because of a decision to "undertreat," the HMO (and the treating physician in some cases) must shoulder the financial burden of covering more extensive – and more expensive – medical procedures. Thus, HMOs have an incentive to keep members healthy for as long as possible. *See generally Herdrich v. Pegram,* 170 F.3d 683, 684 (7th Cir. 1999) (Easterbrook, J. dissenting from denial of reh'g en banc). Ms. Colini's efforts to attack the cost-

containment structure of managed care health plans as undisclosed and contrary to the medical interests of patients cannot obscure the fact that this structure has been understood and approved for many years. *See, e.g., Anderson v. Humana Inc.*, 24 F.3d 889, 890 (7th Cir. 1994) (noting that while "an HMO has an incentive" to minimize health care utilization "in order to save costs," "HMOs also have a reason to deliver excellent preventive medicine. Prevention may reduce the need for costly services later.").

In any event, Ms. Colini's late-breaking displeasure with managed care's well-understood and legislatively approved cost-containment mechanisms is not the grist from which lawsuits arise. In one sense, what she has filed more closely resembles proposed legislation or a notice of proposed rulemaking.[2] Such proposals, however, are committed to political and administrative processes. They should be directed to Congress, state legislatures, or administrative agencies. "[J]udicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993) (citation omitted). To overturn the solutions that Congress and the states have designed in the managed care arena would be to deny the "basic principles of democratic government" dictating that "[p]olicy choices are for the political branches, and Congress is the supreme branch for making such choices." *Mississippi Poultry Ass'n v. Madigan*, 31 F.3d 293, 299 (5th Cir. 1994).

---

[1]    *See* U.S. General Accounting Office, GAO/HEHS-98-154, *Employer-Based Managed Care Plans: ERISA's Effect on Remedies for Benefit Denials and Medical Malpractice* 7 (1998).

[2]    Indeed, some commentators have noted that rather than actually being quests to obtain redress for actual injuries, this and other class actions against HMO companies are "part of an ambitious plan to restructure the way health care is delivered in this country." *Who's Afraid of Dickie Scruggs?*, Newsweek, Dec. 6, 1999, at 48 (Doc. App., Tab D). Humana's Document Appendix includes a selection of materials that either (a) are relied upon in plaintiff's complaint, or (b) the existence of which is otherwise subject to judicial notice. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 n.16 (11th Cir. 1999) (reversing district court's decision to strike documents appended to defendant's motion to dismiss).

In another sense, what Ms. Colini presents here is merely a grievance with her

employer – a demand that the health care coverage provided to her be modified. But she is

not charging her employer with breaching any promise or duty, and there is no suggestion in

the complaint that she has even raised these issues with her employer.[3] And even if she were

taking legal aim at her employer in some respect, that would not be a matter appropriately

presented to this Court in a lawsuit against Humana.

At bottom, through this purported "lawsuit," Ms. Colini seeks to obtain from

Humana health coverage that is beyond the mandate of the relevant legislative or regulatory

regime and beyond what her employer has legally decided to provide. However, such a

lawsuit presents no real claims that could appropriately be resolved by this Court. For all of

her rhetoric about the perceived evils in the existing health care system and the changes she

wishes to make, Ms. Colini fails to state *any* legally cognizable claim for relief. Her

Complaint therefore should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## BACKGROUND AND SUMMARY OF ARGUMENT

Ms. Colini, a Florida resident, is an employee of the Broward County School

Board. (Complaint ("Compl.") ¶ 16.) In 1993, her employer offered her a choice between

two Humana health plans, an HMO and a PPO, among other choices. (*Id.* ¶¶ 16(a) & (b).)

She chose the PPO. (*Id.* ¶ 16(b).) She now brings this action on behalf of a purported class of

"*all persons in the United States* who are, or were, enrolled in Humana Inc.'s [HMOs]

preferred provider organizations ("PPOs") and/or point of service plans ("POSs"), operated

---

[3]      Neither has Ms. Colini chosen to attack her physicians, whom she impliedly accuses of being willing to withhold care for purely economic reasons in violation of their Hippocratic Oath and various state and federal laws. *Cf.* Fla. Stat. Ann. § 641.51(3) (prohibiting professional judgment of physician from being modified by managed care organizations, but expressly permitting utilization review and other cost-containment practices).

by . . . Humana Inc. at any time during the period from October 4, 1995 through and after the date" of the Complaint.  (*Id.* ¶ 1 (emphasis added).)  She also purports to represent a sub-class of *all* such persons, wherever situated in the United States, who obtained Humana coverage "through their employers' ERISA-governed health benefits plans" from October 4, 1993 through the present.  (*Id.* ¶¶ 1 & 2.)

Ms. Colini charges Humana with concealing "accurate information about when health care will be provided, when claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of coverage."  (*Id.* ¶ 3.) While the subject matter of the complaint is clearly health coverage (*see, e.g., id.* ¶ 10), Ms. Colini herself does not allege that she has ever been denied coverage under her health plan. Instead, she claims that the ways in which Humana *might* have treated a hypothetical request for coverage *in the past* – and how it *might* address a hypothetical request *in the future* – have somehow affected the value of the coverage provided by her employer-sponsored managed care plan.  (*Id.* ¶ 52.)

The fact that Ms. Colini purports to represent millions of others not before the Court only makes her individual claims more spurious, however.  Her legal theories of fraudulent nondisclosure cannot be maintained in the face of state and federal laws that expressly authorize (if not promote) the very practices that the claims are unlawful – practices that are by definition a matter of public knowledge.  The very cost-containment incentives she attacks have been publicized and judicially recognized for years.  *See, e.g., Anderson*, 24 F.3d at 890 (dismissing state-law challenge to HMO incentive structure).  Indeed, on the very page of the very securities filing Ms. Colini cites as fraudulent (*see* Compl. ¶ 35(5)) – as in numerous other regulatory filings and other documents – Humana itself announced to the world the very practices plaintiffs contend have been concealed.  (*See* Report of Humana Inc.

on Form 10-Q for the period ended March 31, 1999, at 11 (Doc. App., Tab B) ("HMOs and PPOs control health costs by various means, including . . . risk-sharing arrangements with providers. These providers may share medical cost risk or have other incentives to deliver quality medical services in a cost-effective manner.").)

Ms. Colini pitches her nondisclosure theory in four different ways: a RICO claim predicated on mail and wire fraud (Count I), an ERISA claim for breach of express disclosure obligations (Count II), an ERISA claim for breach of fiduciary duty (Count III), and a claim for failure to provide benefits due under an ERISA plan (Count IV).[4] These claims fail for multiple reasons.

- To the extent she demands monetary relief, the filed rate doctrine bars all four of Ms. Colini's claims – under RICO and ERISA – because state regulators have already reviewed and approved the reasonableness of Humana's rates. (*See* pp. 13-17 *infra*.)

- The Court must abstain from granting injunctive relief under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), to avoid interfering with a carefully crafted state managed care regulatory regime. (*See* pp. 17-18 *infra*.)

- RICO does not permit recovery for speculative "risk injuries" like Ms. Colini's claim of injury based on a reduction in the value of her health coverage (Count I). (*See* pp. 20-24 *infra*.)

- Ms. Colini cannot prove materiality, reliance and causation – essential elements of her RICO claim (Count I) – because although according to the Complaint (Compl. ¶ 16(b)), her employer offered other health care plans, she did not choose a different plan after learning of the allegedly concealed facts. (*See* pp. 24-27 *infra*.)

- Ms. Colini's ERISA claims (Counts II-IV) are barred because she has not exhausted her administrative remedies. (*See* pp. 29-30 *infra*.)

- The ERISA statutory claim (Count II) fails because Ms. Colini cannot point to any specific provision requiring disclosure of the Humana practices of which she complains. (*See* pp. 31-33 *infra*.)

---

[4]    The counts in Ms. Colini's Complaint are numbered I-III, but there are two counts numbered II. This memorandum treats the second Count II as Count III and Count III as Count IV.

- Ms. Colini's claim for failure to provide benefits (Count IV) founders on the fact that she does not allege that she has even been denied benefits to which she was entitled. (*See* pp. 44-46 *infra*.)

The entire complaint must therefore be dismissed.

## ARGUMENT

### I. MS. COLINI'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE EXTENSIVE ARRAY OF STATE AND FEDERAL LAWS AND REGULATIONS THAT SPECIFICALLY PERMIT AND REGULATE THE CHALLENGED FEATURES OF MANAGED CARE.

The four claims Ms. Colini raises are barred in their entirety because HMOs and other forms of managed care are both specifically permitted and comprehensively regulated by state and federal law. ***Each*** of the ubiquitous HMO cost-containment practices Ms. Colini attacks – (1) physician compensation arrangements, such as capitation[5]; (2) utilization review and management processes[6]; and (3) the use of unaffiliated private firms to develop utilization standards and to conduct medical necessity reviews of requested services – is firmly rooted in governing state law. For example, Florida law provides that insurers "may include the following managed care provisions in the[ir] polic[ies] or contract[s] to control costs: . . . a preferred provider arrangement or exclusive provider organizations . . . [a] procedure for utilization review ... [and any] additional managed care and cost containment provisions, subject to the approval of the department" of insurance. Fla. Stat. Ann. § 627.6699(12)(b)(3). The practices challenged by Ms. Colini similarly are expressly recognized in other states' laws and in federal health care laws and regulations.

---

[5]    "Capitation" is defined by statute in Florida to mean "the fixed amount paid by an HMO to a health care provider under contract with the health maintenance organization in exchange for the rendering of covered medical services." Fla. Stat. § 641.19(3). This definition is echoed in Humana's web site – ironically, one of the alleged sources of misinformation Ms. Colini identifies in the complaint: Capitation is "[a] monthly payment to providers based on membership rather than services provided. The payment covers contracted services and is paid in advance of care being provide[d]. Capitation is expressed as a 'per member per month' amount." (Attached at Tab C.)

Ms. Colini apparently hopes this Court will find in the general provisions of RICO and ERISA the authority to add a new layer of federal disclosure requirements on top of the state (and federal) regulatory schemes governing the specific cost-containment practices at issue. But the relevant state insurance laws contain their own unique, carefully crafted sets of disclosure rules, which would become all but irrelevant if the general provisions of RICO and ERISA were interpreted to require a substitute set of rules. In similar circumstances, a growing chorus of courts has rejected efforts to entangle the federal judiciary in disputes concerning business practices in heavily regulated industries like the insurance industry. While these courts have rested their holdings on a variety of doctrinal grounds, they all have relied on the same principle of judicial non-interference with comprehensive state regulatory regimes. As Judge Highsmith of this Court recently observed:

> The doctrines addressed by the Court – *Burford* abstention and the filed rate doctrine – as well as other arguments presented by the defendants which the Court did not need to reach, such as exhaustion of administrative remedies, are simply variations on the same theme. The problems which the plaintiffs have presented to this Court are best addressed by state legislative and regulatory bodies.

*Morales v. Attorneys' Title Ins. Fund*, 983 F. Supp. 1418, 1429-30 (S.D. Fla. 1997) (dismissing federal-law claims against regulated insurer under Rule 12(b)(6)). As in these prior cases, Ms. Colini's efforts to use federal statutes to fabricate a previously unknown set of legal constraints for health insurers flies in the face of contrary state and federal law. The complaint should therefore be dismissed in its entirety.

---

[6]    Utilization review typically is defined to mean "a system for reviewing the medical necessity or appropriateness in the allocation of health care resources . . . given or proposed to be given to a patient or group of patients." Fla. Stat. Ann. § 395.002(31).

A. **THE COMPREHENSIVE STATE AND FEDERAL LAWS THAT PERMIT AND REGULATE THE VERY COST-CONTAINMENT PRACTICES AT ISSUE PRECLUDE THE FINDING OF CONCEALMENT ESSENTIAL TO MS. COLINI'S CLAIMS.**

1. ***The Practices Ms. Colini Attacks Are Permitted And Regulated By A Complex Web Of State And Federal Law.***

Ms. Colini's health plan is subject to regulation by Florida law. In addition, certain aspects of federal health care statutes and regulations are relevant to her claims. The laws of these jurisdictions specifically recognize and regulate the practices she alleges have somehow been concealed.

a. **State Legal And Regulatory Regimes**.

Ms. Colini's request for judicial relief, as well as her underlying criticisms of managed care, contradicts the panoply of laws and regulations governing managed care. Florida requires health insurers to obtain a license or certificate of authority prior to engaging in the HMO business. *See* Fla. Stat. Ann. § 641.21(1).[7] Flowing from this certification requirement are four categories of authority that collectively belie the assertion that managed care cost-containment practices either are unlawful or were concealed.

***First***, Florida expressly recognizes and regulates each of the cost-containment practices Ms. Colini challenges.[8] For example:

- ***Florida law specifically recognizes the power of managed care organizations to capitate providers***. *See* Fla. Stat. Ann. § 641.31(31)(d).

- ***Florida law specifically authorizes health insurers to conduct utilization review***. *See* Fla. Stat. Ann. § 627.6699(12)(b)(3)(b).

---

[7]    Insurers in Florida offering PPO and POS plans must also comply with licensing and filing requirements for those products. *See* Fla. Stat. Ann. § 627.410 (generally applicable filing requirement).

[8]    In addition to negating the element of concealment, these specific authorizations to conduct the very activities Ms. Colini says are criminal preclude any possibility that she can satisfy the criminal intent element of the alleged RICO predicate act of mail fraud. Specific statutory authorization to do an act, after all, negates the intent required to justify punishment for the act. *See, e.g., BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996).

- ***Florida law permits health insurers to contract with third parties to conduct utilization review activities***. Fla. Stat. Ann. § 395.0199(2).

***Second***, Florida has adopted disclosure requirements that comprehensively regulate the content of documents provided to subscribers. Indeed, state regulators are required to approve these documents in advance. For example:

- ***Ms. Colini's contracts of health coverage were subject to filing and approval requirements***. Florida law requires that certificates of coverage – the contracts under which insureds receive the health benefits – be filed with and approved by the state Department of Insurance ("DOI"). *See* Fla. Stat. Ann. § 641.21(1)(f).

- ***Other member materials – including the very "Disclosure Documents" on which Ms. Colini relies on – are subject to regulatory review and approval requirements.*** *See* Fla. Stat. Ann. § 641.31(3) (requiring member handbooks, contracts, and other materials to be filed).

- ***Contracts with physicians and other providers are subject to filing requirements.*** *See* Fla. Stat. Ann. § 641.234(1).

***Third***, Florida requires HMOs to file their rates with the state insurance regulatory agency, which must approve such rates in advance. *See* Fla. Stat. Ann. § 641.31(d).

***Fourth***, Florida has adopted a comprehensive administrative enforcement regime to police the cost-containment practices (and associated disclosures) used by health insurers. The DOI has authority either to suspend or revoke a managed care company's certificate of authority, *see* Fla. Stat. Ann. § 641.23(2), or to impose a specified administrative penalty in lieu of suspension or revocation, *see id.* § 641.25.[9]

---

[9]    The Florida legislature is ***currently*** considering the appropriate balance between access to health care and containment of health care costs, as well as the appropriate remedies for any deviation from this balance – a debate that should not be short-circuited by judicial order. *See, e.g.*, S.B. 424 and H.B. 291 (Fla.) (regarding civil remedies for denials of requested health services).

b.    **Federal Law.**

Federal law is relevant to Ms. Colini's wrongful nondisclosure-based claims

for two reasons. *First*, in the Health Maintenance Organization Act, 42 U.S.C. §§ 300e –

300e-17, Congress directly authorized HMOs to share financial risks and rewards with

physicians in order to discourage the unnecessary use of expensive medical treatments.

Indeed, the HMO Act specifically requires managed care companies to assume financial risk

for the care of their subscribers, and authorizes HMOs to place some or all of this risk on

providers – the very incentives Ms. Colini claims are unlawful. *See* 42 U.S.C. § 300e(c) (an

HMO "may . . . make arrangements with physicians or other health professionals, health care

institutions, or any combination of such individuals or institutions to assume all or part of the

financial risk on a prospective basis for the provision of basic health services by the

physicians or other health professionals or through the institutions."). And Congress, in

enacting the statute, plainly understood – and desired – that effective cost containment, and

"cost consciousness," would result from these financial arrangements. *See Health*

*Maintenance Organizations: Hearings on H.R. 5615 and H.R. 11728 (and all identical bills)*

*Before the Subcomm. on Public Health and Environment of the House of Representatives*

*Comm. on Interstate and Foreign Commerce*, 92nd Cong. 56 (1972) (statement of Secretary,

Department of Health, Education and Welfare).[10] It is *because of* these well-recognized

---

[10]    This popular understanding among lawmakers has only strengthened over the years. In 1991, for
example, managed care organizations continued to be characterized in terms of their cost-containment capacity.
At one congressional hearing, Robert Reischauer, Director of the Congressional Budget Office, stated that
managed care was specifically intended to "ferret out unnecessary and inappropriate care by *reviewing and
intervening in the decision to provide various services.*" *Options for Health Insurance: Requirements for
Health Care Cost Containment: Hearings on Serial 102-48 Before the Subcommittee on Health of the House of
Representatives Comm. on Ways and Means*, 102nd Cong. 104 (1991) (emphasis added). Other such statements
in the legislative record abound. *See, e.g., Health Care Reform: Hearings Before the Subcomm. on Health and
Environment of the House of Representatives Comm. on Energy and Commerce*, 102nd Cong. 23-25, 66-69, 259,
271 (1991).

characteristics of managed care organizations, not in spite of them, that longstanding federal rules required all employers with 25 or more employees to offer a qualified HMO as a benefit option to their employees. *See* 42 C.F.R. § 417.151 (1994). Given such clear congressional intent to foster the growth of managed care as a means of health care delivery, it is clear that Congress – not the courts – must decide whether additional, costly disclosure obligations are to be imposed.

      *Second*, rules governing federal Medicare, Medicaid, and other programs – though not directly implicated by Ms. Colini's complaint – highlight the prevalence, as well as the legitimacy, of the very practices she attacks. In the Medicare context, for example, the federal government *itself* makes capitated payments to HMO entities, *see* 42 C.F.R. § 422.252 (setting forth formula for calculation of capitation rates) – despite Ms. Colini's assertions that such payments create an inherent conflict of interest. (*See* Compl. ¶ 48(b)(5).) Medicare regulations have consistently *required* health plans serving Medicare beneficiaries to "[d]evelop procedures for utilization review." 42 C.F.R. § 421.200(f)(2)(iv). And the Medicare physician incentive regulation, which expressly permits the use of physician compensation arrangements that create incentives to limit overall utilization of medical services (subject only to regulatory requirements), specifically rejects the notion that the particulars of such incentives must be affirmatively disclosed to Medicare participants – requiring only that they be disclosed on request. *See* 42 C.F.R. § 417.479. The regulation also requires that all physician arrangements be disclosed to the federal Health Care Financing Administration, further negating Ms. Colini's allegations of concealment. *See id.*

2.    **State And Federal Recognition, And Regulation, Of The Challenged Cost-Containment Practices, Together With State Laws Requiring Regulatory Approval Of The Challenged "Disclosure Documents," Preclude Any Finding Of Concealment As A Matter Of Law.**

In an effort to mask her frontal assault on managed care, Ms. Colini attempts to cast her legal challenge not as an attack on cost-containment practices *per se*, but merely as a challenge to the alleged wrongful nondisclosure of these practices. This rhetorical sleight-of-hand fails for two reasons: (1) the fact that Humana is required to submit its "disclosure documents" to state regulators, who are statutorily charged with determining whether those documents were misleading, negates any wrongful nondisclosure claim as a matter of law; and (2) the fact that applicable statutes and regulations expressly permit the allegedly concealed practices should, as a matter of law, be deemed to put her on notice of these practices.

Ms. Colini cannot maintain a concealment-based lawsuit where, as here, the very documents alleged to contain the deceptive omissions were subject to regulatory filing and approval requirements. This point was recently reemphasized in *Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998), where a putative class of AT&T customers challenged the company's practice of billing long-distance telephone services in whole-minute increments without disclosing that practice in its marketing materials. Affirming the dismissal of the class claims, the Second Circuit noted that AT&T's policy was required to be disclosed in its filings with the Federal Communications Commission, and relied on the "presumed knowledge" doctrine, under which "[t]he [customer's] knowledge of the lawful rate" – meaning not only the price itself, but the contents of all associated documents required to be filed with a regulatory agency – "is conclusively presumed." *Id.* at 63. This Court should do likewise.

Independently, that federal and state statutes and regulations describe and permit (subject to regulation) the underlying practices Ms. Colini challenges – capitation, utilization review, third-party claims analysis – is sufficient to bar their claims of concealment as a factual matter. Every litigant is charged as a matter of law with knowledge of the contents of published statutes and regulations. *See, e.g., Gowland v. Aetna Cas. & Sur. Co.*, 960 F. Supp. 101, 105 (W.D. La. 1997) (dismissing plaintiff's claim because of presumed knowledge of insurance regulations published in Code of Federal Regulations).[11] Thus, for example, Ms. Colini cannot allege that Humana concealed its use of capitation payments to physicians, given that the federal HMO Act specifically defines HMOs as entities that make capitation payments. *See* 42 U.S.C. § 300e(c). Similarly, the fact that utilization review is a defining practice of HMOs under applicable state laws precludes her allegation that Humana concealed its right to conduct utilization review.

Collectively, the body of federal and state laws governing managed care companies like Humana demonstrates not only that all of the cost-containment practices Ms. Colini attacks are lawful, but also that they are not susceptible to a back-door "nondisclosure" attack. Accordingly, all of her claims should be dismissed.

### B.    MS. COLINI'S REQUEST FOR MONETARY RELIEF IS BARRED BY THE FILED-RATE DOCTRINE.

The filed-rate doctrine bars all four of Ms. Colini's claims to the extent they request monetary relief because Humana's rates have been reviewed and approved by Florida regulators. The complaint speculates that the health coverage actually provided to Ms. Colini was worth less than the coverage described in the "disclosure documents," and therefore that

---

[11]    *See also UGI Corp. v. Watt*, 644 F. Supp. 16, 19-20 (M.D. Pa. 1985) (charging plaintiffs with knowledge of interest-payment provisions published in federal surface mining statute and regulations); *Cohen v.* (cont'd)

she should be permitted to recover monetary damages calculated based on the "difference between the value of the coverage benefit purchased and the value of the coverage benefit actually provided." (Compl. ¶ 55.) In other words, she alleges that, in some indeterminate way, Humana charged too much for its health plans.

Under the filed-rate doctrine, where regulated companies are required by federal or state law to file proposed rates or charges with a regulatory agency, any rate approved by the agency "is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *see also Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992) (*en banc*) ("[T]he filed rate doctrine recognizes that where a legislature has established a scheme for . . . rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme."). Since its first application in 1922 to preclude antitrust damages claims against a common transportation carrier whose rates were regulated by the Interstate Commerce Commission, *see Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922), federal courts have applied the doctrine in all cases where plaintiffs challenge agency-approved rates and judicial action would either undermine the agency's authority to determine the reasonableness of rates, or result in regulated entities charging rates other than those the agency has approved or reviewed. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577-78 (1981).[12] The doctrine has regularly been applied to bar challenges to the reasonableness of filed insurance rates and charges. *See Korte*

---

*Federal Ins. Admin.*, 565 F. Supp. 823, 827 (E.D.N.Y. 1983) (to same effect as *Gowland*).

[12] Because these two interests are implicated regardless of whether a federal or state agency is responsible for the underlying ratemaking, every court to have considered the question has held that the filed rate doctrine precludes federal claims even where the challenged rates or charges have been filed with a state regulatory agency. *See, e.g., Destec Energy, Inc. v. Southern Cal. Gas Co.*, 5 F. Supp. 2d 433, 458-59 (S.D. Tex. 1997); *Wegoland*, 27 F.3d at 20; *Taffet*, 967 F.2d at 1494; *Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 693 (Tex. App. 1996).

*v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 651 (E.D. Tex. 1999); *Allen v. State Farm Fire & Cas. Co.*, 59 F. Supp. 2d 1217, 1228-29 (S.D. Ala. 1999); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1428-29 (S.D. Fla. 1997).

As explained in Section I.A.1 above, the regulatory regimes governing Ms. Colini's managed care plans are comprehensive, including filing, rate calculation, and rate review rules. Inasmuch as HMOs must disclose their so-called "disclosure documents" to the Department of Insurance, moreover, the rates approved by the department fully reflect the value of the coverage as described in those documents, and not an inflated value in any abstract sense. And Florida's ratemaking law provides avenues for administrative rate challenges that are inconsistent with private civil litigation as a means of rate review. Pursuant to the filed-rate doctrine, therefore, any claim that Humana has charged too much for its health plan subscriptions in Florida, must be directed to the Florida Department of Insurance and cannot be pursued collaterally in court.

In a transparent attempt to circumvent the preclusive effect of the filed-rate doctrine, Ms. Colini couches her complaint in terms of fraud. But as the Eleventh Circuit held in *Taffet*, "[a] regulated entity's alleged fraud does not create a right to a reasonable rate that exists independent of agency action." *Taffet*, 967 F.2d at 1494-95 (affirming dismissal on filed-rate grounds under Rule 12(b)(6)). Indeed, district courts have specifically applied the filed-rate doctrine to preclude fraud-based challenges to insurance rates approved within the insurance regulatory regimes of some of the jurisdictions at issue. In *Morales v. Attorneys' Title Ins. Fund*, for example, the plaintiffs sued several title insurers alleging violations of the federal Real Estate Settlement Practices Act and several state-law fraud doctrines. Despite the plaintiff's assertion that they sought only money damages and not recalculation of the defendants' filed rates, Judge Highsmith of this Court stated that "[i]t is evident . . . that,

despite their protestations, the plaintiff's claims are nothing more than a challenge to Florida's rate structure." 983 F. Supp. at 1429. Finding the Florida system of insurance rate regulation to be "comprehensive," *id.* at 1426, Judge Highsmith relied on *Taffet* and dismissed plaintiff's claims pursuant to Rule 12(b)(6). The U.S. District Court for the Eastern District of Texas recently reached an identical result. *See Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650 (E.D. Tex. 1999) (dismissing consumer fraud challenge to allegedly fraudulently inflated insurance premium based on filed-rate doctrine).

Courts have applied the filed-rate doctrine to bar claims based on theories of intangible economic injury directly comparable to those asserted by plaintiffs here. For instance, in *Byan v. Prudential Insurance Co. of America*, 662 N.Y.S.2d 44 (N.Y. App. Div. 1997), plaintiff sought to represent a purported nationwide class of individuals who had purchased so-called "medigap" policies from the defendant. Plaintiff's specific claim was that the insurer had failed to disclose that its payments to physicians for covered services were lower than the physicians' usual and customary fees. The relief sought, as in this case, was a refund of the difference between the premiums she had paid and the lower premium she allegedly would have paid had she been privy to the payment arrangements. It was clear that the premium established for the coverage she purchased had been filed with and reviewed by the Superintendent of Insurance. *See id.* Because the complaint alleged that the plaintiff was "damaged by being required to pay the premium rate approved by the Superintendent of Insurance, instead of any lower rate," the filed-rate doctrine was held to preclude the claim. *Id.* at 45.

The common theme in cases applying the filed-rate doctrine is that the doctrine's applicability does not turn on the particular legal theories advanced by the plaintiff. Instead, "the focus for determining whether the filed rate doctrine applies is the impact the

court's decision will have on agency procedures and rate determinations." *H.J. Inc.*, 954 F.2d at 489. Thus, regardless of whether a plaintiff brings her action under a theory of tort, fraud, or breach of contract, a court must refrain from awarding monetary relief – whether under legal or "equitable" theories – that would require the court to measure the difference between the filed-rate and the rate that might have been approved or paid absent the conduct in issue. *See id.* at 488; *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 337 (1998) (holding that, under filed-rate doctrine, plaintiffs "may not seek to recover any money from respondents, whether they label their request one for disgorgement or otherwise").

### C.    THE DOCTRINE OF *BURFORD* ABSTENTION BARS MS. COLINI'S REQUEST FOR INJUNCTIVE RELIEF.

Closely related to the filed rate doctrine is the doctrine of *Burford* abstention. In *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), the Supreme Court held that where a request for injunctive relief could do violence to a carefully crafted, comprehensive state regulatory scheme, the federal courts should dismiss the case, or "abstain," rather than grant the requested relief. As developed in later cases, the doctrine of *Burford* abstention has increasingly been regarded as the equitable twin of the filed rate doctrine: where the prerequisites of the filed rate doctrine are present but the relief requested is injunctive rather than monetary, the *Burford* doctrine provides the doctrinal basis for dismissal. Thus, in *Morales* (where the plaintiff's request for monetary relief was dismissed on filed-rate grounds), Judge Highsmith invoked *Burford* abstention to dismiss the plaintiff's alternative request for injunctive relief. *See Morales*, 983 F. Supp. at 1424 n.13.[13]

---

[13]    Other courts, including the U.S. Supreme Court, have invoked *Burford* abstention to dismiss claims identical to those at issue here. *See, e.g., Tafflin v. Levitt*, 493 U.S. 455 (1990) (affirming dismissal of RICO claim on grounds of *Burford* abstention); *Chandler v. Omnicare/The HMO, Inc.*, 756 F. Supp. 187 (D.N.J. 1990) (dismissing ERISA claim on grounds of *Burford* abstention).

Here, the case for abstention is particularly strong, given that Ms. Colini seeks sweeping injunctive relief as to Humana's disclosure practices on the sole basis of her status as a Humana subscriber. She does not seek to compel Humana to pay for specific, medically necessary benefits that she contends are owing under their plan (relief that would, of course, be available under ERISA). (*See infra* pp. 44-46.) Rather, she wants to use the general provisions of federal law – in conjunction with Fed. R. Civ. P. 23 – to compel a nationwide restructuring of Humana's managed care operations, even though those operations are closely scrutinized and subject to prescriptions (and proscriptions) by regulators in Florida and all across the country. Yet as numerous courts have recognized, class litigation cannot be the "superior" means of claims resolution where a dedicated administrative process for reviewing claims is available. *See, e.g., Pattillo v. Schlesinger*, 625 F.2d 262 (9th Cir. 1980) (class action not superior means of resolving back-pay grievance where administrative process was available).[14] "Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand." *Burford*, 319 U.S. at 334.

## II.    MS. COLINI'S RICO CLAIM IS MERITLESS.

Ms. Colini's RICO claim proceeds from the startling assumption that it is a "crime" – federal mail fraud (Compl. ¶ 61) – for Humana to operate its managed care plans using well-known cost-containment measures specifically described in state and federal laws and regulations, and that Humana could have had the requisite mens rea for this crime despite having disclosed these measures in countless public documents and regulatory filings. She makes the even more astonishing claim that she has somehow been injured by this "crime" –

---

[14]    *See also Kamm v. California City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975) (class action not superior means of resolving claims already being handled by state Attorney General and Real Estate Commissioner); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 353 (D.N.J. 1997) (class action not superior means of resolving claims because "[t]here are also administrative remedies that are available to (cont'd)

and are thus entitled to a recovery under 18 U.S.C. § 1964(c) – even though she alleges not a single instance in which Humana's use of these measures has ever resulted in her being denied coverage for medically necessary care.

These implausible contentions cannot survive Rule 12. Even if the Court were to suspend disbelief and assume that operation of a managed care plan is somehow contrary to law, Ms. Colini has altogether failed to allege how Humana's alleged "crimes" have injured her business and property interests in any concrete, non-speculative way. She complains vaguely about the diminished "value" of her managed care policies, but this is simply an artifice designed to obscure the preclusive fact that she does not allege having ever been denied coverage for any "medically necessary" health care. Moreover, the complaint pleads a number of important facts that establish beyond doubt that Humana's alleged conduct legally could not have diminished the "value" of her health coverage at all.

For similar reasons, the only district court to consider parallel RICO class action allegations attacking managed care recently dismissed the case in its entirety under Rule 12(b)(6). *See Maio v. Aetna, Inc.*, No. Civ. A. 99-1969, 1999 WL 800315 (E.D. Pa. Sept. 29, 1999) (dismissing RICO claim on grounds of plaintiff's failure to allege injury-in-fact).[15] Eleventh Circuit precedent requires the same result here. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla.*, 140 F.3d 898, 906 (11th Cir. 1998) (affirming dismissal of RICO claim because plaintiffs failed to allege actual injury that was the "direct result" of cognizable racketeering activity).

---

plaintiffs"); *Ford Motor Co. v. Magill*, 698 So.2d 1244, 1245 (Fla. Dist. Ct. App. 1997) (reversing class certification because of availability of federal administrative remedy).

[15]    Another district court, reviewing class allegations of HMO nondisclosure under the Lanham Act, came to a similar conclusion, finding that the speculativeness of plaintiff's fraud theory precluded class certification. *See Ford v. NYLCare Health Plans of the Gulf Coast*, Civ. A. No. 96-1564 (S.D. Tex. Dec. 1, 1999).

A.    **As a Matter of Law, Ms. Colini's Theory of a Loss in the "Value" of Her Insurance Coverage Does Not Qualify as RICO Injury.**

Ms. Colini asks this Court to undertake nation-spanning RICO class action litigation on a singular (and dubious) theory of economic injury – that alleged "crimes" by Humana somehow affected the "value" of the managed care benefits she obtained through her employer. The complaint does not explain the mechanism of causation for this alleged injury, but it is obviously rooted in rank speculation. Thus, the complaint hypothesizes, *if* Ms. Colini had developed a covered medical condition over the previous few years, and *if* that condition had required a treatment in the form of a covered medical service, she *might* have been denied treatment, and that denial *might* have been the result of wrongfully undisclosed cost-containment measures. And, on the theory that *if* she had known of this possibility she *might* have been able to do something about it (like "request[] that [her] employer provide another Health Plan or options . . . other than Humana" that *might* have charged premiums that more accurately reflected their use of cost-containment measures (Compl. ¶ 74)), the complaint hypothesizes that she suffered economic injury in the form of a loss in "value" of her coverage "whether or not [she] ever submitted claims for medical losses." (Compl. ¶ 100.)

This theory of injury is utterly fictional. Because it requires the Court to speculate about hypotheticals (and patently false hypotheticals at that), it cannot qualify as RICO injury to "business or property" under the federal racketeering statute. Ms. Colini says she purchased insurance coverage for all care that "satisfied the Medical Necessity Definition set forth in her Humana policy" (Compl. ¶ 16(c)); in short, she claims that she obtained contract rights to Humana coverage for all "medically necessary" procedures. Logically, whether these contract rights have been "as valuable" to her as they were allegedly "represented" to be by Humana (*e.g.*, Compl. ¶ 16(d)) can only be assessed in light of the

actual performance rendered to Ms. Colini under her current and expired policies (*i.e.*, Humana's coverage decisions on her actual claims). Yet, as far as the complaint reveals, she has never been denied coverage by Humana for any "medically necessary" procedures. Thus, as far as her expired policies are concerned, Ms. Colini's contract rights to insurance coverage have been honored as to every specific claim she has filed.

It is meaningless to suggest that Ms. Colini suffered a loss in the "value" of her Humana subscription because of the hypothetical possibility of a denial of coverage for "medically necessary" procedures *when she does not claim any such denial*. Any monetary recovery for her on her RICO claims would simply be a windfall. She is like a newspaper subscriber who sues for partial refund of her subscription price on the ground that her home might have been missed on the delivery route once or twice over the last year on account of the negligence of delivery personnel – even though, in actual fact, her own newspapers arrived on time each and every day of the subscription. This fictional plaintiff, like Ms. Colini, got exactly what she paid for; she has no genuine injury. As the District Court for the Eastern District of Pennsylvania observed in dismissing nearly identical RICO allegations against Aetna, Ms. Colini's managed care subscriptions "simply [could not have been] 'worth less' unless something [she was] promised was denied them." *Maio*, 1999 WL 800315, at *2.

Nor can RICO injury be found in the mere conjectural possibility that a claim for coverage might not be honored at some time down the road. *Cf., e.g., Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 415 (11th Cir. 1995) (action for declaration that insurers had duty to defend and indemnify with respect to as-yet-unfiled litigation held not justifiable; "speculation based on the insurance companies' dealings with other insureds does not present a concrete case or controversy"); *Maryland Ins. Co. v. Attorneys' Liab. Assurance Soc'y Ltd.*, 748 F. Supp. 627, 632 (N.D. Ill. 1990) (dismissing action for declaration of rights

and liabilities of two insurers concerning settlement of underlying lawsuit where settlement had not occurred and "no actual liability yet exist[ed]"). In the words of the District Court for the Eastern District of Pennsylvania, "[a] vague allegation that 'quality of care' may suffer in the future is too hypothetical an injury to confer standing on plaintiffs . . . ." *Maio*, 1999 WL 800315, at *2; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (claims involving "contingent future events that may or may not occur as anticipated" cannot be maintained) (citation omitted); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971) ("[I]t is hornbook law. . . [that] future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.").[16]

Thus, in *First National Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994), the Second Circuit refused to engage in speculation about a financial institution's claim of injury growing out of loans that, at the time of suit, were being repaid on schedule. In that case, the plaintiff alleged that the defendants misrepresented the value of the collateral to obtain larger loans than would have been made had plaintiff known the true value of the collateral. *Id.* at 766. The plaintiff sought to recover damages for the "risk of loss" of the additional funds it loaned based on the defendants' misrepresentations. *Id.* at 768. The Second Circuit rejected the claim of RICO injury. Because the loans had not yet been foreclosed and the amount of damages was undetermined at that time, the court held that the plaintiff had not suffered any cognizable harm and lacked a cause of action under RICO to

---

[16]    *See also Arabian Am. Oil Co. v. Scarfone*, 713 F. Supp. 1420, 1421 (M.D. Fla. 1989) ("It is well-established that potential exposure or a mere possibility of [a lawsuit] is insufficient to satisfy the requirement of injury necessary to maintain a suit pursuant to 18 U.S.C. § 1964(c)"); *Anitora Travel, Inc. v. Lapian*, 677 F. Supp. 209, 216 (S.D.N.Y. 1988) ("Mere speculation that some injury might occur . . . is insufficient to state a RICO claim.); *Jones v. Baskin, Flaherty, Elliot & Mannino, P.C.*, 670 F. Supp. 597, 599 (W.D. Pa. 1987) (stating that the "hypothetical possibility" of a future injury "will not suffice as an injury to confer [RICO] standing").

pursue fraud-based damages. *Id.* at 769. Similarly, in *Oscar v. University Students Co-Operative Ass'n*, where the plaintiff apartment owners sued their neighbors under RICO to recover the purported reduction in rental values allegedly caused by the neighbors' drug-related activity, the Ninth Circuit held that the plaintiffs' speculation that their neighbors' activities might negatively impact their subletting values was insufficient to satisfy RICO's requirement of a direct "financial loss." 965 F.2d 783, 787 (9th Cir. 1992) (en banc).

The near-universal rejection of unmanifested "lost value" claims under RICO is consistent with the broader legal rule that private civil litigants cannot seek recovery for hypothetical economic injuries that are based on incidents that have not yet occurred. The Eleventh Circuit held as much in *Kane v. Shearson Lehman Hutton, Inc.*, where the court rejected a stock investor's damages theory premised on the "speculative assertion" that he might have sold stock at the stock's maximum price had he not been misled by the defendant's alleged misrepresentations. 916 F.2d 643, 647 (11th Cir. 1990). Similarly, in *Briehl v. General Motors Corp.*, plaintiffs alleged a loss in resale value for their vehicles as a result of allegedly defective anti-lock braking systems, notwithstanding that none of the plaintiffs' brakes had malfunctioned and no plaintiff had actually sold a vehicle at a reduced price. 172 F.3d 623, 628-29 (8th Cir. 1999). Like Ms. Colini here, the *Briehl* plaintiffs sought damages for the difference between what they expected (vehicles with anti-lock brakes) and what they actually got (vehicles with anti-lock brakes alleged to create the *potential* of an automobile accident), on the theory that this unmanifested risk of injury could be redressed through an economic award. *See id.* at 629. Holding such a claim for damages too speculative as a matter of law, the Eighth Circuit stated that "[w]here . . . a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at

628.[17]

In sum, the federal RICO statute, like the common law, does not permit a monetary recovery for risks that have not manifested themselves in the past, and may never manifest themselves in the future. Because Ms. Colini has not alleged, and presumably cannot allege, that Humana has denied coverage for any medically necessary care, her RICO claim fails for want of any injury.

**B.    MS. COLINI'S FAILURE TO EXERCISE HER OPTION TO CHANGE HEALTH PLANS PRECLUDES THE ELEMENTS OF MATERIALITY, RELIANCE, AND CAUSATION REQUIRED TO SUSTAIN HER RICO CLAIM.**

Wholly apart from the fact that Ms. Colini has not been harmed, it is clear from the complaint that she had alternatives to the Humana plans offered by her employer and that even after learning of the allegedly concealed information, Ms. Colini did not exercise her option to change her health plan. Ms. Colini's inaction negates at least three elements – materiality, reliance, and causation – that are absolute prerequisites for any civil RICO claim.

Under the RICO doctrine of materiality, a civil RICO plaintiff cannot recover unless she can demonstrate that she would have acted differently but for the defendant's alleged racketeering activity. *See, e.g., Aeropulse, Inc. v. Armstrong & Brooks Ltd.*, 740 F. Supp. 938, 942 (E.D.N.Y. 1990) (summary judgment awarded to defendant where it was

---

[17]    Federal and state cases rejecting attempts to recover for unmanifested injury on a "lost value" theory are legion. *See, e.g., Yost v. General Motors Corp.*, 651 F. Supp. 656, 657 (D.N.J. 1986) (plaintiff cannot state a claim based on allegation that "design defect" in automobile engine is "likely to cause major . . . damage . . . and may create potential safety hazards"); *Pfizer v. Farsian*, 682 So. 2d 405, 407 (Ala. 1996) ("[F]ear that [a product] could fail in the future is not, without more, a legal injury sufficient to support [a product liability or fraud claim]"); *American Suzuki Motor Corp. v. Superior Court*, 44 Cal. Rptr. 2d 526, 531 (Cal. Ct. App. 1995) (tort and contract doctrines do not "contemplate indemnity for a potential injury that [has] never . . . materialized."), *modified on other grounds on denial of reh'g*, 1995 Cal. App. LEXIS 913 (2d Dist. Sept. 21, 1995); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1455 (S.D. Tex. 1996) ("Plaintiffs cannot succeed on any on their claims [including fraud, breach of warranty, and negligent misrepresentation] without demonstrating that they have in fact been injured.") (citing cases); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 602 (cont'd)

undisputed that the plaintiff would have selected the same insurance product even if he had

been aware of the alleged undisclosed facts).[18]  Similarly, civil RICO plaintiffs (like Ms.

Colini) who rely on a mail or wire fraud theory are required to allege and prove that they

actually relied on the alleged misrepresentations or omissions. *See, e.g., Pelletier v. Zweifel*,

921 F.2d 1465, 1510 (11th Cir. 1991).[19]  And in a related vein, controlling Eleventh Circuit

precedent imposes a strict pleading requirement that the alleged misrepresentations or

omissions have been the proximate cause of the alleged injuries. *See Pelletier*, 921 F.2d at

1499 ("[A] plaintiff has standing to sue under Section 1964(c) only if his injury flowed

directly from the commission of the predicate acts.").  The common policy uniting the RICO

doctrines of materiality, reliance, and causation is that the civil provisions of RICO provide a

remedy only for injuries that flow foreseeably and directly from the alleged criminal acts.

      Ms. Colini acknowledges in her complaint that she must plead materiality,

reliance, and proximate causation.  The complaint contends that she "reasonably relied" on

"Humana's disclosures", and "would have taken corrective measures" had she known of the

allegedly concealed cost-containment practices. (Compl. ¶ 74.)  This assertion is completely

at odds, however, with plaintiff's own asserted reality.  The two Humana plans offered by Ms.

Colini's employer were "in addition to other health insurance choices." (Compl. ¶ 16(b)).

Yet, despite these other choices and seemingly inconsistent with Ms. Colini's purported

outrage and dissatisfaction with her Humana plan, Ms. Colini "continue[s] to enroll in

Humana health plans." (Compl. ¶74.)  Thus, according to her own pleadings, she learned of

---

(S.D.N.Y. 1982) ("Plaintiff's bald assertion that a 'common' defect [in their tires] which never manifests itself 'ipso facto caused economic loss' . . . is simply not the law.").

[18]    *See also Wynn ex rel Alabama v. Philip Morris, Inc.*, 51 F. Supp. 2d 1232, 1249 (N.D. Ala. 1999) (holding that the plaintiff did not suffer any injury to compete in the market under RICO or antitrust laws because he never competed or participated in the market, nor did he plan to do so).

the alleged misrepresentation and yet did not change her health coverage. Under such circumstances, a RICO injury simply cannot be established. Ms. Colini cannot be said to have "relied" on an allegedly concealed fact (and such concealment could not have been "material" or the "cause" of her choice) when disclosure of the allegedly concealed information did not result in her selection of a different health plan.

Even though Ms. Colini has the opportunity to switch health plans and has not exercised her option, she engages in a number of speculative scenarios as to possible alternative responses in which she may have engaged if she had known earlier of Humana's allegedly concealed practices. First, Ms. Colini suggests that she could have "request[ed] that her employer provide another Health Plan or options . . . other than Humana." (Compl. ¶ 74.) Such an assertion seems far-fetched and irrelevant when her employer already offered alternatives that Ms. Colini failed to use.

She also implies, almost ludicrously, that she might not have worked as hard for her employers had she known the value of her health care coverage. (Compl. ¶ 80 (but for alleged misconduct, Ms. Colini "would not have paid as much for her Health Policies as, in fact, [she] paid in cash, salary deductions *and labor*" (emphasis added).) These are the very kinds of speculative assertions the courts have consistently rejected in enforcing RICO's requirement that injuries be *directly* related to the alleged predicate acts. *See, e.g., International Bhd. of Teamsters, Local 734 v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (rejecting as "hopelessly speculative" ERISA plan's claim that, with disclosure of allegedly concealed facts, it would have educated its members about the dangers of smoking, which in turn might have decreased the plan's outlays for smoking-related illnesses);

---

[19]    *See also FDIC v. Bayles & Co.*, No. 87-1468-CIV-T-17B, 1992 WL 161055, at *8 (M.D. Fla. June 30, 1992) (entering judgment for defendant and holding that "civil RICO plaintiffs must allege and prove reliance in (cont'd)

*Aeropulse*, 740 F. Supp. at 942 (rejecting plaintiff's RICO attack on an allegedly inflated price based on his assertion that he "would have protested, not paid it," had he known the true facts). Ms. Colini's claim of RICO injury founders for this independent reason.

### C.    MS. COLINI HAS FAILED PROPERLY TO PLEAD THE EXISTENCE OF A RICO ENTERPRISE.

Ms. Colini's RICO claim should also be dismissed on the independent ground that the complaint fails to allege a proper RICO "enterprise" pursuant to 18 U.S.C. § 1961(4). She alleges two association-in-fact enterprises – the "National Enterprise" and "State and Local Enterprises" – consisting of "Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies." (Compl. ¶¶ 63-64, 67-68.) This pleading is patently defective, as neither enterprise is alleged to possess the requisite character of ongoing organizations with members who "function as a continuing unit," *United States v. Turkette*, 452 U.S. 576, 583 (1981), as shown by "a hierarchical or consensual decision making structure," *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995). Indeed, Ms. Colini fails to allege that these component actors share any common purpose. Rather, the alleged enterprises here consist of tens of thousands of actors who are entirely independent of Humana and have goals, needs, and agendas that do not resemble those of Humana or other members of either enterprise, and may well be contrary to those interests. Moreover, the law does not favor ungainly, industry-wide "enterprises" like the ones alleged here. *See, e.g., Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (rejecting industry-wide "enterprise" consisting of criminal justice officials, national and local medical associations, state police, and local and state prosecutors' offices). *See also Maio v. Aetna Inc.*, No. Civ. A. 99-1969, 1999 WL 800315, at *2 (E.D. Pa. Sept. 29,

---

cases using the mail and wire fraud statutes").

1999) (dismissing virtually identical "enterprise" pleading as insufficient).[20]

### D.   MS. COLINI FAILS TO ALLEGE THAT SHE HAS BEEN INJURED BY REASON OF DEFENDANT'S USE OR INVESTMENT OF RACKETEERING INCOME.

Ms. Colini's alternative RICO theory – that Humana's cost-containment practices violate 18 U.S.C. § 1962(a) (Compl. ¶ 57) – fails because she does not allege that she has been injured "by reason" of a violation of § 1962(a).  To recover for a violation of § 1962(a), a plaintiff must allege that she has been injured "by reason of" the use or investment of racketeering income rather than by reason of the underlying predicate acts from which the income was derived.  18 U.S.C. § 1964(c); *see, e.g., Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132-33 (6th Cir. 1994); *Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co.*, 981 F.2d 429, 437-38 (9th Cir. 1992); *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303-05 (3d Cir. 1991), *abrogated on other grounds as recognized in Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d Cir. 1995); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229-30 (D.C. Cir. 1991); *Quaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149-51 (10th Cir. 1989); *In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F. Supp. 342, 367 (S.D. Fla. 1991).  The mere reinvestment of racketeering income that allegedly permits an entity to commit more predicate acts is not enough.  *See, e.g., Vemco*, 23 F.3d at 132-33; *Brittingham*, 943 F.2d at 303-305.  And yet that's all Ms. Colini alleges.  The complaint says that Humana used or invested its racketeering income "to acquire interests in or to operate the aforementioned enterprises" and that the "aforementioned

---

[20]      Additionally, under the majority federal rule holding that a RICO "enterprise" must be adequately distinct from the defendant, plaintiff's RICO claim is legally untenable.  *Compare United States v. Hartley*, 678 F.2d 961, 988 (11th Cir. 1982) (holding that an entity may be both the defendant and the enterprise) *with* (cont'd)

enterprises" in turn injured Ms. Colini by engaging in the same predicate acts from which the

racketeering income was allegedly derived. (Compl. ¶ 81.) Her § 1962(a) claim must

therefore be dismissed.

### III.    MS. COLINI'S COMPLAINT FAILS TO ALLEGE A VIOLATION OF ERISA.

Even if Ms. Colini could get past the threshold problems that preclude all four

of her claims, her ERISA claims fail for five independent reasons.

#### A.    MS. COLINI'S FAILURE TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES REQUIRES DISMISSAL OF ALL OF HER ERISA COUNTS.

All three of Ms. Colini's ERISA claims must be dismissed because she does

not allege that she exhausted the administrative remedies under her plan.[21]  *See Byrd v.*

*MacPapers, Inc.*, 961 F.2d 157, 160-61 (11th Cir. 1992).  The Eleventh Circuit has repeatedly

held that ERISA requires a plan participant to exhaust administrative remedies prior to

commencing suit under the statute.  In its leading case on this issue, the Eleventh Circuit

recognized that:

> Administrative claim-resolution procedures reduce the number
> of frivolous lawsuits under ERISA, minimize the cost of dispute
> resolution, enhance the plan's trustees' ability to carry out their
> fiduciary duties expertly and efficiently by preventing
> premature judicial intervention in the decisionmaking process,
> and allow prior fully considered actions by pension plan trustees
> to assist courts if the dispute is eventually litigated.

*Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).  On multiple

---

*Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 24 (1st Cir. 1998) (holding to the contrary); *Official Publications, Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir. 1989) (same).

[21]    Ms. Colini's failure to allege exhaustion further underscores the bizarre "no injury" character of this lawsuit.  Humana remains contractually bound to provide all covered services.  If Humana had actually violated

(cont'd)

occasions since deciding *Mason,* the Eleventh Circuit has reaffirmed this principle by ordering dismissal of unexhausted ERISA claims.[22] While some circuits have limited the exhaustion requirement to ERISA claims for benefits, the Eleventh Circuit continues to make clear that the exhaustion doctrine in this jurisdiction applies to alleged statutory violations of ERISA (such as claims for breach of fiduciary duties) as well as to simple claims respecting the denial of benefits. *See Mason,* 763 F.2d at 1227 (applying exhaustion requirement to claims of breach of fiduciary duty under ERISA §§ 404 and 406, violations of reporting and disclosure requirements under ERISA §§ 102 and 104, and interference with protected rights under ERISA § 510); *Counts,* 111 F.3d at 109 ("We have consistently stated that the exhaustion requirement applies both to actions to enforce a statutory right under ERISA and to actions brought to recover benefits under a plan.").[23]

Here, Ms. Colini's complaint contains no suggestion that she pursued her administrative remedies to conclusion, or that administrative grievances would be futile based on specific alleged facts. The exhaustion requirement is designed to preclude just such an end-run around the administrative process. Her failure to plead that she has fulfilled this requirement requires dismissal of each of her ERISA claims. *Byrd,* 961 F.2d at 160-61.

---

that obligation, she presumably would have sought to invoke her contract rights rather than pursue a speculative claim of "lost value" by means of this action.

[22]    *See Counts v. American Gen. Life and Accident Ins. Co.,* 111 F.3d 105, 108 (11th Cir. 1997); *Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.,* 57 F.3d 1040, 1042 (11th Cir. 1995); *Byrd,* 961 F.2d at 160-61; *Harrison v. United Mine Workers of Am. 1974 Benefit Plan & Trust,* 941 F.2d 1190, 1193 (11th Cir. 1991); *Springer v. Wal-Mart Assocs.' Group Health Plan,* 908 F.2d 897, 899 (11th Cir. 1990); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 846 (11th Cir. 1990).

[23]    *See Response Oncology, Inc. v. MetraHealth Ins. Co.,* 978 F. Supp. 1052, 1063 (S.D. Fla. 1997) ("[The exhaustion] requirement applies to both actions based on alleged statutory violations and breach-of-contract actions."); *Variety Children's Hosp. Inc. v. Blue Cross/Blue Shield of Fla.,* 942 F. Supp. 562, 568 (S.D. Fla. 1996) ("The exhaustion requirement applies to breach of contract claims and to actions premised on alleged statutory violations."); *Foster v. Cordis Corp.,* 707 F. Supp. 517, 517-18 (S.D. Fla. 1989) (applying exhaustion requirement to claims for breach of fiduciary duty and other statutory violations).

**B.    MS. COLINI'S CLAIM FOR BREACH OF STATUTORY DISCLOSURE RESPONSIBILITIES IS WITHOUT ANY BASIS UNDER ERISA.**

Ms. Colini's first ERISA count (Count II) alleges that Humana breached express disclosure obligations under the statute. (Compl. ¶¶ 83-88.) This allegation fails to state a claim because the statute does not include the requirements she asserts.

It is true that one obligation of a plan administrator[24] – as distinct from other fiduciaries to the plan – is to prepare the primary statutory disclosure document known as the summary plan description ("SPD"), *see* ERISA § 102(b), which is intended to be a summary in layman's terms of specified plan provisions. In the Eleventh Circuit's words, "[t]he SPD is Congress's established method for apprising participants [and beneficiaries] of the terms of a particular plan." *Barnes v. Lacy*, 927 F.2d 539, 543 (11th Cir. 1991). Yet the disclosures required to be made in SPDs are limited to specified items, none of which has anything to do with physician compensation arrangements, particularized criteria used to determine the medical necessity of requested services, or any other cost-containment practices Ms. Colini attacks.

Significantly, Congress has twice amended ERISA § 102 in recent years to require additional disclosures about group health plans.[25] *See* Pub. L. No. 104-191, §

---

[24]    A threshold problem with Count II stems from Ms. Colini's failure to identify the "administrator" of her plan. The express disclosure obligations found in Part 1 of Title I of ERISA, *see* ERISA §§ 101-111, 29 U.S.C. §§ 1021-1031, fall not on every plan fiduciary but only on a plan's "administrator." *See Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498 (11th Cir. 1987); *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 692 n.5 (11th Cir. 1992). Ms. Colini does not allege that Humana was the "administrator" with respect to their plans. (*See* Compl. ¶¶ 1, 4, 24.) Accordingly, she has failed to state a claim under ERISA's reporting and disclosure provisions. *See, e.g., Chambers v. Kaleidoscope, Inc. Profit Sharing Plan & Trust*, 650 F. Supp. 359, 367-68 (N.D. Ga. 1986) (holding that a bankruptcy trustee, who is not a plan administrator, has no obligation to provide information under ERISA's reporting and disclosure provisions); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993) (affirming dismissal of complaint alleging disclosure violations because plaintiff failed to allege that defendant was plan administrator); *cf. Rosen v. TRW, Inc.*, 979 F.2d 191, 193-94 (11th Cir. 1992) (allegation that defendant employer was acting as plan administrator, and that official administrator was defunct, stated claim against employer-as-administrator for benefits under ERISA).

[25]    These amendments added a disclosure requirement regarding whether a health insurance issuer is responsible for financing or administration of the plan, and, if so, disclosure of the name and address of the (cont'd)

101(c)(2), 110 Stat. 1936, 1951 (1996); Pub. L. No. 104-204 §§ 603(a), 603(b)(3)(C),

100 Stat. 2874, 2935-38 (1996). Yet, despite (and perhaps because of) widespread publicity

about managed care physician compensation arrangements and utilization review practices, no

disclosure requirement relating to those elements of managed care has been enacted. Nor do

the extensive Department of Labor regulations governing SPDs require such disclosures. *See,*

*e.g.,* 29 C.F.R. §§ 2520.101, 2520.102, 2520.103, 2520.104, 2520.104a, 2520.104b (1999).

Although the Department has proposed amendments to these regulations, the proposed

amendments would not require that SPDs include disclosures about physician compensation

arrangements, a managed care plan's contractual relationships with third parties, or how a

managed care organization makes a medical necessity determination.[26] *See* 63 Fed. Reg.

48,376, 48,385 (proposed Sept. 9, 1998); 63 Fed. Reg. 48,372 (proposed Sept. 9, 1998).

      A similar attempt to obtain a judicial enlargement of ERISA's detailed

disclosure scheme was recently considered and rejected by the Tenth Circuit. In *Jones v.*

*Kodak Medical Assistance Plan,* 169 F.3d 1287 (10th Cir. 1999), the plaintiff argued that

ERISA required a plan administrator to publish its medical necessity criteria as part of the

SPD. The court disagreed, observing that § 102 of ERISA does not require "particularized

criteria for determining the medical necessity of treatment for individual illnesses." *Id.* at

1292. The court reasoned that "such a requirement would frustrate the purpose of a summary

---

issuer, *see* Pub. L. No. 104-191, § 101(c)(2), 110 Stat. 1936, 1951 (1996), and a disclosure requirement
regarding changes in standards relating to benefits for mothers and newborns. *See* Pub. L. No. 104-204, §
603(a), 110 Stat. 2874, 2935-37 (1996).
[26]    DOL proposed that the regulations be amended to require that SPDs for welfare benefit plans providing
HMO benefits include the plan's requirement respecting eligibility for participation and for benefits; a
description of the benefits; circumstances which may result in disqualification, ineligibility, loss, or suspension
of benefits; the identity of any funding medium used for accumulation of assets through which benefits are
provided; and procedures to be followed in presenting claims for benefits. 63 Fed. Reg. 48,376, 48,377. DOL
also proposed that the regulations be amended to require disclosures regarding whether the plan is a group health
plan and what participants' rights and obligations are under the continuing coverage provisions of COBRA. *Id.*
at 48,378-79.

– to offer a layperson concise information that she can read and digest." *Id.* Judge Kehoe of

this Court reached a similar conclusion in another case, writing that the SPD "is not required

to list every single exception or qualification to plan provisions." *Williams v. Cordis Corp.*,

No. 91-0484-CIV, 1993 WL 373940, at *8 (S.D. Fla. May 13, 1993).

Since § 102 of ERISA says nothing about the arrangements between health

plans and physicians, or medical necessity determinations, Ms. Colini also invokes § 104(b)

of ERISA to support her inflationary vision of required disclosures. (Compl. ¶ 87.) But this

provision offers no help either. Section 104(b) of ERISA simply requires a *plan*

*administrator* to furnish a plain language description of a *modification* or *change* that is a

material reduction in covered services or benefits within 60 days of the date of such change or

modification. Her allegations do not square with this provision. Her complaint not only does

not identify the administrator of her plan as Humana or one of its subsidiaries, it also fails to

pinpoint any *modification* or *change* in her plans that supposedly would have triggered the

plan administrator's obligation. She does allege that Humana did not fully disclose how its

plans operated. (*See id.* ¶ 86.) But the mere operation of a plan and application of its

provisions do not constitute "change" or "modification" in covered services.[27]

### C.  MS. COLINI'S CLAIMS FOR BREACH OF FIDUCIARY DUTY UNDER ARE FATALLY DEFECTIVE.

#### 1.  *Ms. Colini's Claim In Count III That Operation Of A Managed Care Plan Is Unlawful Per Se Is Baseless.*

Perhaps because her nondisclosure claims are unsupportable, Ms. Colini

---

[27]    The complaint is facially infirm for another reason. Several courts have indicated that in cases of reporting and disclosure violations, "an aggrieved participant *must* sue under Section 502(a)(1)(A) for the relief provided by [Section 502(c)]." (emphasis added; brackets in original). *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167 (3d Cir. 1990); *Labrache v. American Maritime Officers Pension Plan*, 34 F. Supp. 2d 1335, 1340 (M.D. Fla. 1999) (same); *Mohalley v. Kendall Health Care Prods. Co.*, 903 F. Supp. 1530 (M.D. Ga. 1995) (same); *Welsh v. GTE Serv. Corp.*, 866 F. Supp. 1420 (N.D. Ga. 1994), *aff'd*, 61 F.3d 32 (11th Cir. 1995) (same). Ms. Colini has failed to invoke § 502(a)(1)(A) or seek remedies under § 502(c), which imposes liability (cont'd)

advances a separate claim apparently not founded upon allegations of wrongful nondisclosure:

that the mere operation of a managed care plan including certain cost-containment measures is

a violation of the fiduciary duty of loyalty under ERISA. Her allegations in this regard, and

their obvious invitation for judicial policymaking, are stark:

> While managed health care need not be provided in a manner
> that creates a conflict of interest between an ERISA fiduciary
> and beneficiaries, Humana took purposeful actions, described in
> detail above, that created a conflict of interest between Humana,
> as fiduciary, and members of the Sub-Class, as beneficiaries.

(Compl. ¶ 92.) Count III thus unmasks Ms. Colini's intention of remaking national health

policy through Rule 23's class-action device, based on the supposition that ERISA's general

fiduciary provisions have the effect of outlawing capitation, utilization review, and other basic

elements of managed care that are otherwise permitted by state and federal law.

This supposition has received judicial recognition only once, in a 2-1 decision

of the Seventh Circuit which was recently accepted for review by the Supreme Court. *See*

*Herdrich v. Pegram*, 154 F.3d 362 (7th Cir. 1998), *cert. granted*, 120 S. Ct. 10 (1999). Yet

*Herdrich* (which, unlike this case, entailed allegations of medical malpractice and personal

injury arising out of an actual failure to provide services) is an outlier that is not binding in

this jurisdiction and – for reasons explained below – is not likely to survive review by the

Supreme Court.

The problem with Ms. Colini's *Herdrich* theory is that it runs counter to the

fundamental principle that ERISA does not create any substantive entitlement to particular

kinds of health care benefits – or any health care benefits at all. Those substantive

entitlements are determined by employers; they are questions of plan design, and ERISA's

---

only when a participant requests information from an administrator. Here, there is no allegation that she
requested any information from her plan administrators.

fiduciary duty provisions must be construed and applied with respect for employers' choices.

*See Lockheed Corp. v. Spink*, 517 U.S. 882, 889 (1996).[28] Thus, while ERISA provides that a

person is a fiduciary with respect to an employee benefit plan to the extent, *inter alia*, that

such person has discretionary authority or responsibility "in the administration of [the] plan,"

29 U.S.C. § 1002(21)(A), that fiduciary status cannot extend to a health insurer's

implementation of a managed care model where the employer has chosen that model as part

of the plan's design. As Judge Easterbrook explained in his opinion dissenting from the

denial of rehearing en banc in *Herdrich*:

> Perhaps it would be possible to read "in the administration of
> [the] plan" broadly in order to catch all discretionary elements
> of the HMO structure, but why should courts do this? In order
> to wipe out HMOs and foreclose the possibility that plan
> sponsors will choose that structure (or that participants will
> select it from among options the plan offers)? The panel's
> opinion sounds very much like this is the objective: its lengthy
> condemnation of managed care . . . otherwise is hard to
> understand. But ERISA does not tie the plan sponsor's hands
> on issues of plan design. An employer is free to offer an HMO
> as an option without objection on fiduciary-duty grounds.
> *Hughes [Aircraft Co. v. Jacobson*, 119 S. Ct. 755 (1999)] and
> *Lockheed*, which put plan-design issues outside the scope of §
> 1002(21), establish this point. If it is lawful under ERISA for
> an employer to ***offer*** an HMO as a welfare benefit, then it must
> be lawful for the HMO itself to ***administer*** a managed-care
> system.

*Herdrich v. Pegram*, 170 F.3d 683, 685 (7th Cir. 1999) (Easterbrook, J., dissenting from

denial of rehearing en banc). For these reasons, Humana's mere act of implementing

managed care policies offered through the welfare benefit plans of Ms. Colini's employer is

not subject to the fiduciary provisions of ERISA.

---

[28]    *See also Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 456
(6th Cir. 1984) ("courts have no authority to decide which benefits employers must confer upon their employees;
these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate,
by federal legislation.").

This conclusion is not undermined by the fact that Humana allegedly may have acted as a fiduciary in other unspecified respects. (*See* Compl. ¶¶ 91-92.) Both Congress and the Supreme Court have recognized that ERISA permits a person both to assume a fiduciary role for one purpose and to pursue his or her self-interest when acting outside that role. *See Hughes Aircraft*, 119 S. Ct. at 763; *Lockheed Corp.*, 517 U.S. at 890; *see also* 29 U.S.C. § 1108(c)(3) (employer may act as plan sponsor (a non-fiduciary role) and plan administrator (a fiduciary role)). Indeed, this recognition is mandated by ERISA's text, which specifies that a person does not become a fiduciary for all purposes, but only "to the extent" that he or she exercises certain discretionary powers. *See* 29 U.S.C. § 1002(21)(A). Thus, for example, employers may (and doubtless do) consider the effect on their profitability in deciding what benefits to offer in the design of a welfare benefit plan. Yet, when those very same employers make coverage, eligibility, and other administrative decisions under their plans, they must act with an "eye single" to the interests of the plan beneficiaries. *See Hughes Aircraft*, 119 S. Ct. at 763 ("an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets"). By analogy, even assuming that Humana engaged in fiduciary functions with respect to the welfare benefit plan offered by Ms. Colini's employer, it would not be a breach of fiduciary responsibilities for Humana, acting solely as a provider of health coverage, to protect its financial self-interest through the use of cost-containment measures.[29]

---

[29]    Thus, other district courts recently have dismissed claims similar to Count III.A. *See, e.g., Weiss*, 972 F. Supp. at 753 ("Weiss' contention that CIGNA's compensation package [for physicians] facially violates ERISA simply because it deprives her of her right to receive 'medical opinions and referrals unsullied by mixed motives,' . . . is tantamount to a claim that risk-sharing arrangements in managed care are inherently illegal, a position that is refuted by federal and New York law . . . . Moreover, plaintiff's concern about the soundness of managed care policy is best suited for resolution by branches of government other than the judiciary.") (citation omitted).

If Count III states a claim for which relief may be granted, then "the principal organizational forms through which medical care is delivered today are unlawful. If this conclusion is correct, then the cost-saving achieved by managed care must be abandoned, and the cost of medical care will rise, perhaps substantially." *Herdrich*, 170 F.3d at 686 (Easterbrook, J., dissenting from denial of rehearing en banc). ERISA neither requires nor permits this conclusion.

2.    ***Even If Recharacterized As A Nondisclosure Claim, Ms. Colini's ERISA Claim For Breach Of Fiduciary Duty Must Be Dismissed.***

Perhaps sensing the futility of her attempt to persuade this Court to legislate an expansion of ERISA's fiduciary provisions in a way that would ban managed care outright, Ms. Colini suggests in Count III – but does not explicitly say – that ERISA's general fiduciary duty provision, 29 U.S.C. § 1104, creates an obligation on the part of HMOs to disclose their contractual arrangements with physicians. (*See, e.g.*, Compl. ¶ 96.) Section 404 of ERISA does not, however, supplant ERISA's express disclosure provisions and cannot be read to impose additional disclosure obligations. To the extent Ms. Colini's complaint could be read to raise this claim, it must be dismissed.[30]

The Fifth Circuit recently rejected this identical claim in *Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 2000 WL 359 (5th Cir. 2000), finding no support in ERISA's text, structure or legislative history for the imposition of a broad duty to disclose physician compensation plans. *Id.* at *2. Relying on the basic canon of statutory construction that "the specific language in a statute rules the general," the court refused to "add to the

---

[30]    Even if it were appropriate to read into ERISA § 404 a requirement that Humana disclose its internal cost-containment practices, Ms. Colini's oblique pleading of such a fraud-based ERISA theory would require dismissal under Fed. R. Civ. P. 9(b). *See, e.g., J. Geils Band Employee Benefit Plan v. Smith Barney Shearson,* (cont'd)

specific disclosure requirements that ERISA already provides." *Id.* (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). The court also invoked the teaching of the Supreme Court in *Curtiss-Wright Corporation v. Schoonejongen*, 514 U.S. 73, 84 (1995), heeding the Supreme Court's warning that "where ERISA provides a section specifically dealing with a particular information scheme, courts should not supplement that scheme by reference to a far away provision in another part of the statute." *Ehlmann*, 2000 WL 359 at *2. Finally, the Fifth Circuit repudiated Ehlmann's characterization of ERISA's underlying purposes, which interpreted ERISA Section 404's incorporation of the common law of trusts as an invitation to sweep in disclosure requirements above and beyond ERISA's extensive statutory obligations. The court held that "the legislative history of ERISA . . . runs against Ehlmann's overly broad construction of Section 404." *Id.* at *3.

This analysis is in accord with the decisions of many other courts. For example, in *Weiss v. CIGNA HealthCare, Inc.*, 972 F. Supp. 748 (S.D.N.Y. 1997), the plaintiff asserted that the defendant HMO breached its fiduciary duty by failing to disclose the nature of its physician compensation arrangements, information that was alleged to be material because it "affect[ed] the ability of current Plan participants to 'make an intelligent assessment of whether their physicians' medical recommendations should be questioned.'" *Id.* at 753 (quoting plaintiff's memorandum). The district court dismissed the claim under Rule 12(b)(6).

> Had Congress seen fit to require the affirmative disclosure of physician compensation arrangements, it could certainly have done so in ERISA §§ 101-111. The general fiduciary obligations set forth in ERISA § 404 do not refer to the disclosure of information to Plan participants, and it would be "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing" about such duties.

---

*Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996) (affirming summary judgment against plaintiffs' ERISA fiduciary nondisclosure claim in part on Rule 9(b) grounds)).

*Id.* at 754 (quoting *Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997)).[31]

In sum, Humana has no duty to disclose its cost containment practices either under ERISA's carefully crafted disclosure provisions or under its general fiduciary duty provisions. "It is for Congress to determine whether to impose such a duty to disclose under ERISA and this court will not encroach on that authority by imposing a duty which Congress had not chosen to impose.." *Ehlmann*, 2000 WL 359, at *2. There is no question that this claim – which Ms. Colini inadequately pleads if she pleads it at all – must be dismissed.

### D.   THE RELIEF MS. COLINI REQUESTS TO REDRESS THE ASSERTED BREACHES OF FIDUCIARY DUTY IS NOT AVAILABLE UNDER ERISA.
#### 1.   *The Relief Ms. Colini Seeks Is Not Authorized.*

---

[31]    Consistent with this approach, several appellate courts have held that Congress's failure to impose an express duty of disclosure such as the one Ms. Colini (perhaps) alleges argues against implying such a duty through strained interpretation of ERISA's general fiduciary duties. *See Schoonejongen*, 514 U.S. at 79-86; *Hughes Salaried Retirees Action Comm. v. Admin. of the Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 689 (9th Cir. 1995) (*en banc*); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996) (ERISA's disclosure provisions provide the exclusive disclosure obligations of fiduciaries); *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 405 n.15 (6th Cir.) (*en banc*) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed. . . . [W]hen Congress and the Department of Labor have carefully prescribed a detailed list of matters that must be disclosed to plan participants and beneficiaries, it ill-behooves federal judges to add to that list."), *cert. denied*, 523 U.S. 923 (1998).

In contrast to these decisions, in one appellate decision, *Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir.), *cert. denied*, 522 U.S. 914 (1997), an Eighth Circuit panel concluded that an HMO's alleged failure to disclose certain financial incentives could state a claim for breach of the HMO's fiduciary duty under ERISA. Even if *Shea* were controlling in this circuit, it is inapposite to this case. The plaintiff in *Shea*, unlike plaintiff here, alleged serious injury — the death of her husband — directly arising from an alleged failure to disclose. Finding the beneficiary's wrongful death claim under Minnesota law to be preempted by ERISA, the court of appeals held that ERISA created a duty to disclose the financial arrangements between the HMO and the doctor under the circumstances of the case.

Moreover, just this year, the Eighth Circuit signaled a lack of confidence in the *Shea* analysis and ruling in *Ince v. Aetna Health Management*, 173 F.3d 672 (8th Cir. 1999). In that case, the court of appeals characterized *Shea* as involving only "a breach of the plan administrator's duty [in ERISA § 102] to publish an accurate description of plan benefits to participants and beneficiaries." *Id.* at 676. Thus, as revised by *Ince*, the *Shea* decision says nothing more than that a plan administrator might violate ERISA § 102 by failing to include in the SPD a description of the HMO's compensation arrangements with physicians. In this respect, of course, the Eighth Circuit's revised *Shea* analysis is an anomaly; ERISA § 102, and the Department of Labor regulations that implement it, contain a long series of express disclosure requirements for plan administrators, but they do not include disclosure of physician contractual arrangements.

40

Ms. Colini claims that she is entitled to "equitable relief" under ERISA

§ 502(a)(3)[32] – namely, money – to redress the purported breaches of fiduciary duty,

discussed above. (Compl. ¶ 97.) She is mistaken. At best, her fiduciary duty claims are

merely disguised claims for benefits (and meritless ones at that) for which ERISA provides a

separate and appropriate remedy.

In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court set out the

circumstances under which an individual plan participant or beneficiary may seek equitable

relief under § 502(a)(3) for a fiduciary's breach of its obligations. In *Varity*, the defendant

employer intentionally tricked the plaintiff employees into withdrawing from their benefit

plan. In assessing whether § 502(a)(3) relief was available to the plaintiffs, the Supreme

Court reviewed each of the causes of action under § 502 and concluded that § 502(a)(3)

creates a "'catchall[]' providing 'appropriate equitable relief' for 'any' statutory violation."

*Id.* at 512. The Court reasoned that this "'catchall' provision[] act[s] as a safety net, offering

appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere

adequately remedy." *Id.* The Court cautioned, however, that

> the statute authorizes "*appropriate*" equitable relief. We should
> expect that courts, in fashioning "appropriate" equitable relief,
> will keep in mind the "special nature and purpose of employee
> benefit plans," and will respect the "policy choices reflected in
> the inclusion of certain remedies and the exclusion of others."
> Thus, we should expect that where Congress elsewhere
> provided adequate relief for a beneficiary's injury, there will
> likely be no need for further equitable relief, in which case such
> relief normally would not be "appropriate."

*Id.* at 515 (citations omitted).

---

[32]    Section 502(a)(3) provides that: "A civil action may be brought by a participant, beneficiary, or
fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or
(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of
this title or the terms of the plan." 29 U.S.C. 1132(a)(3).

Thus, although *Varity* held that ERISA plan participants harmed by a breach of fiduciary duty may obtain individual equitable relief against the breaching fiduciary under ERISA § 502(a)(3), the Court also foresaw that some plaintiffs would -- as plaintiffs have here -- "complicate claims about ordinary benefits by dressing them up in 'fiduciary duty' clothing." *Id.* at 514. The Court noted that where an alleged breach of fiduciary duty relates, as it does in this case, to "the interpretation of plan documents and the payment of claims," § 502(a)(1)(B) already provides a remedy "that runs directly to the injured beneficiary," and that a remedy under § 502(a)(3) is thus not "appropriate." *Id.* at 512.

The Eleventh Circuit recently had occasion to apply this logic. *In Harrison v. Digital Health Plan*, 183 F.3d 1235, 1236 n.1 (11th Cir. 1999), the court upheld a district court's dismissal of a "plaintiff's claim for breach of fiduciary duty as duplicative of [a claim] for recovery of medical benefits under 29 U.S.C. § 1132(a)(1)(B)." The district court cited *Varity* with approval, holding:

> Plaintiff's claim for a breach of fiduciary duty essentially restates her claim that defendants wrongfully refused to pay her medical benefits, a claim for which ERISA elsewhere provides an adequate remedy. 28 [*sic*] U.S.C. § 1132(a)(1)(B). Therefore, the breach of fiduciary duty claim fails to state a claim on which relief can be granted.

*Harrison v. Digital Health Plan,* No. 1:98-CV-348-MHS, 1998 WL 1157098, at *3 (N.D. Ga. June 24, 1998), *aff'd in relevant part*, 183 F.3d 1235 (11th Cir. 1999). Other courts in the Eleventh Circuit have reached the same conclusion,[33] and the Fifth, Sixth, Eighth and Ninth Circuits have adopted this principle.[34]

---

[33]    *Short v. American Cast Iron Pipe Co.*, 961 F. Supp. 261, 266 (N.D. Ala. 1997); *Katz v. Alltel Corp.*, 985 F. Supp. 1157 (N.D. Ga. 1997), *appeal docketed*, No. 98-9251 (11th Cir. 1999).

[34]    In *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604 (5th Cir. 1998) (holding where a participant "'had standing to sue and did sue'" under § 502(a)(1)(B), "'it would be inappropriate for the Court to fashion any further equitable relief under [§ 502](a)(3)'".); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998) ("Because § 1132(a)(1)(B) provides a remedy for [plaintiff's] alleged injury that allows him to bring a (cont'd)

The same analysis should apply here. Despite Ms. Colini's fancy characterization of her breach of fiduciary duty claim, her complaint alleges nothing more than that Humana promised a level of coverage that has not been delivered. According to the complaint, defendant failed "to use the Humana Medical Necessity Definition and appropriate criteria to evaluate the medical necessity of Plaintiff's Sub-Class's *claims* for medical services." (Compl. ¶ 93 (emphasis added).) As a consequence, "Defendants . . . did provide coverage of lesser value than that represented to and purchased by Sub-Class members." (*Id.* ¶ 96.)

Plainly, these allegations, if believed, would invite a benefits claim under § 502(a)(1)(B) from a participant who actually was denied coverage for medically necessary care, or who was given less coverage than promised by Humana. Under the teaching of *Varity*, however, a supplemental equitable remedy under § 502(a)(3) is inappropriate because ERISA makes available a § 502(a)(1)(B) benefits claim to – among other individuals – participants who have personally and individually been denied health care provided by the plan documents.[35] It is of no moment that the Ms. Colini cannot factually make out a benefits claim since she, personally, has not been denied coverage for any "medically necessary" health care procedures. *Short*, 961 F. Supp. at 266 ("[t]he fact that plaintiff has voluntarily dismissed his claim for benefits under § 502(a)(1)(B) is not enough to make relief under § 502(a)(3) appropriate."). The important point is that, if her allegations are believed, other

---

lawsuit . . . he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)."); *Wald v. Southwestern Bell Corp. Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996) ("Because Wald is provided adequate relief by her right to bring a claim for benefits under section 502(a)(1)(B), . . . equitable relief would not be appropriate in her case. Thus, she does not have a cause of action under section 502(a)(3).") (citation omitted); *Forsyth v. Humana Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) ("[i]n these circumstances, *Varity Corp.* does not authorize equitable relief under the catchall provision of section 1132(a)(3)"), *aff'd on other grounds*, 119 S. Ct. 710 (1999).

participants *may* have valid claims for benefits under § 502(a)(1)(B).  As a consequence, *Varity* precludes any supplemental equitable remedy under § 502(a)(3).

2.    ***The Relief Ms. Colini Requests For Her Fiduciary Claims Is Not "Equitable," And Thus Is Not Permitted.***

Even if *Varity* did not bar Ms. Colini's ERISA § 502(a)(3) claim, her demand for money does not seek "equitable relief" that may be recovered under that section. Although she describes her prayer in terms of an "unjust enrichment" (Compl. ¶¶ 95-98), her true intentions are betrayed in the next sentences.  Plaintiffs allege that defendant "receiv[ed] unearned premium revenues" (*id.* ¶ 95), and "intended to retain and did retain the difference in value between the coverage described in [the] Health Policies . . . and the coverage actually provided to the Sub-Class." (*Id.* ¶ 96.)  Plainly this request for damages – compensation for services promised to unspecified plan members but allegedly not delivered – sounds in contract. *See, e.g.*, Dobbs, *The Law of Remedies*, § 12.2 (1993) (discussing contractual remedies).  As the Supreme Court and other courts have recognized, this is classic ***legal*** relief that is unavailable under ERISA § 502(a)(3).

In *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), plaintiff plan participants sought recovery under § 502(a)(3) for losses suffered by their employee benefit plan as a result of a breach of fiduciary duty.  *Id.* at 249-50.  The Supreme Court held that the "other appropriate equitable relief" authorized under § 502(a)(3) is limited to only those types of relief that were typically available in equity, such as injunction, mandamus, and restitution. *Id.* at 255.  Because the *Mertens* plaintiffs sought money damages rather than a remedy

---

[35]    Section 502(a)(1) provides in relevant part:  "A civil action may be brought (1) by a participant or beneficiary — . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1).

traditionally viewed as equitable, the Court held that their requested relief was not available and stated:

> Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages* — monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of *legal* relief.

*Id.* Here, Ms. Colini seeks an identical remedy, specifically, recovery for "unearned premium revenues." (Compl. ¶ 95.) As it was for the *Mertens* plaintiffs, such a remedy is unavailable here. *See also McLeod v. Oregon Lithoprint Inc.*, 102 F.3d 376, 378 (9th Cir. 1996) (holding "'equitable relief' in the form of the recovery of compensatory damages is not an available remedy under § 502(a)(3)"); *Slice v. Sons of Norway*, 34 F.3d 630 (8th Cir. 1994) (money damages are not available under ERISA § 502(a)(3) even if the plaintiff characterizes claim as equitable).[36]

## E.    MS. COLINI'S ERISA CLAIM FOR BENEFITS IS MERITLESS AS WELL.

Ms. Colini's claim for "benefits" under ERISA § 502(a)(1)(B) in Count IV cannot proceed for two reasons. To begin with, she fails to identify the plan and plan

---

[36]    Perhaps recognizing the futility of her claim under ERISA § 502(a)(3), Ms. Colini invokes another civil enforcement provision, ERISA § 502(a)(2), in an attempt to justify her remedial prayer. (Compl. ¶ 98.) Yet in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 140 (1985), the Supreme Court held that § 502(a)(2) permits recoveries on behalf of the plans alone, and does not permit individual participants to recover damages for a breach of fiduciary duty. As the Supreme Court reasoned,

> A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.

*Id.* at 142. This rule has been applied in the Eleventh Circuit. *See Simmons v. Southern Bell Tel. and Tel. Co.*, 940 F.2d 614, 617 (11th Cir. 1991) (holding that ERISA § 502(a)(2) "does not permit an individual beneficiary to recover damages for a breach of fiduciary duties"). Since Ms. Colini has filed this suit in her individual capacity (Compl. ¶¶ 4-5), and not on behalf of her employee benefit plan, no relief is available under § 502(a)(2).

administrators involved. In *Response Oncology, Inc. v. Metrahealth Ins. Co.*, 978 F. Supp.

1052 (S.D. Fla. 1997), the plaintiffs failed to identify, for 27 separate benefit claims under

ERISA, the plans, plan administrators, and whether the plans were self-insured or fully

insured. In dismissing the claims under Rule 12, Judge Graham observed that:

> The basic requirements of ERISA, mandate that a plaintiff
> allege in its Complaint (and not by reference to a later filed
> affidavit or arguments in an opposition memorandum) the
> identity of the ERISA plan, the plan administrator or fiduciary
> of that plan, and the basis for liability of the defendant sued
> pursuant to ERISA.

*Id.* at 1065. On this basis alone, Ms. Colini has failed to meet her threshold pleading

requirements and her claim should be dismissed. *See Gendron v. Franklin Life Ins. Co.*, 980

F. Supp. 1233 (M.D. Fla. 1997) (granting insurance company's motion to dismiss because it

was not the plan administrator and therefore could not be liable under ERISA).

Moreover, this pleading defect is symptomatic of the deeper problem with Ms.

Colini's attempted assertion of an ERISA benefits claim. Contrary to her contention that she

is entitled to a distribution of the withheld "coverage-benefits," an entitlement to a payment of

benefits under an ERISA plan does not arise unless benefits are first sought and denied, and

only after she has exhausted administrative remedies under the plan. (*See* pp. 30-33 *supra*.)

Here, Ms. Colini's demand is not a claim for "benefits" at all, but rather for a refund of

premiums paid. While a plaintiff may recover under Section 502(a)(1)(B) the actual benefit

payments to which he or she is entitled, the courts have uniformly held that a plaintiff may not

recover other monetary relief such as the premium refund that plaintiffs seek here. *See, e.g.,*

*Godfrey v. Bell South Telecommunications, Inc.*, 89 F.3d 755, 761 (11th Cir. 1996); *Medina v.*

*Anthem Life Ins. Co.*, 983 F.2d 29, 32 (5th Cir. 1993). Where, as here, there is no claim of a

specific benefit denial, there is no ERISA claim to recover benefits, and Ms. Colini's attempt

to manufacture such a claim should be rejected.

## CONCLUSION

For the foregoing reasons, Ms. Colini's complaint should be dismissed for

failure to state a claim upon which relief can be granted.

*Of counsel:*                                   Respectfully submitted,

O'MELVENY & MYERS LLP                           _____
555 13th Street, N.W.                           Peter A. Sachs
Suite 500 West                                  Florida Bar No. 349062
Washington, D.C. 20004                          JONES, FOSTER, JOHNSTON
(202) 383-5300                                      & STUBBS, P.A.
                                                505 South Flagler Drive, Suite 1100
                                                Post Office Box 3475
                                                West Palm Beach, Florida  33402-3475

                                                Counsel for Defendant Humana Inc.

Service List


James Fox Miller, Esquire
Charles Fox Miller, Esquire
Greg A. Lewen, Esquire
2435 Hollywood Boulevard
Hollywood, FL 33020
Tel:    954-924-0300
Fax:    954-924-0311

Peter A. Sachs, Esquire
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
Attorneys for Defendant
505 South Flagler Drive, Suite 1100
Post Office Box 3475
West Palm Beach, Florida 33402-3475
Tel:    (561) 659-3000
Fax:    (561) 650-0422

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. mail on James Fox Miller, Esquire, Charles Fox Miller, Esquire, Greg A. Lewen, Esquire, 2435 Hollywood Boulevard, Hollywood, FL 33020 on this _____ day of February, 2000.

Of Counsel:
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Suite 500 West
Washington, D.C.
(202) 383-5300

JONES, FOSTER, JOHNSTON & STUBBS, P.A.
Attorneys for Defendant
505 South Flagler Drive, Suite 1100
Post Office Box 3475
West Palm Beach, Florida 33402-3475
(561) 659-3000

By: _____
Peter A. Sachs
Florida Bar No. 349062

N:\PAS\humanageneral\certservice4.wpd

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE