

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION



REGINA JOI PRICE, on behalf of herself and
all others similarly situated,

     Plaintiff,

vs.

HUMANA INC.,

     Defendant.

_____/

**Case No. 99-8763-CIV-MORENO**
**Magistrate Judge Robert L. Dube**

DONNA MESSINA, on behalf of herself and
all others similarly situated,

     Plaintiff,

vs.

HUMANA INC.,

     Defendant.

_____/

**Case No. 99-3309-CIV-MORENO**

DARA R. LEWEN, on behalf of herself and
all others similarly situated,

     Plaintiff,

vs.

HUMANA INC.,

     Defendant.

_____/

**Case No. 00-6130-CIV-MORENO**

ADRIANA BERRIOS, on behalf of herself and
all others similarly situated,

       Plaintiff,

vs.                             Case No. 00-6131-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/

SARAH A. ROTHMAN, on behalf of herself and
all others similarly situated,

       Plaintiff,

vs.                             Case No. 00-6132-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/

ROBERT L. GUESBY, on behalf of himself and
all others similarly situated,

       Plaintiff,

vs.                             Case No. 00-6136-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/

AILENE COLINI, on behalf of herself and
all others similarly situated,

       Plaintiff,

vs.                             Case No. 00-6139-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/

SUSAN K. SMART, on behalf of herself and
all others similarly situated,

       Plaintiff,

vs.                                 Case No. 00-6140-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/
ALAN WEINGER, on behalf of himself and
all others similarly situated,

       Plaintiff,

vs.                                 Case No. 99-9108-CIV-MORENO

HUMANA INC.,

       Defendant.
_____/

## JOINT RESPONSE OF PLAINTIFFS IN ALL ACTIONS
## TO RULES TO SHOW CAUSE ENTERED IN ALL ACTIONS
### (D.E. No. 109 (Price), D.E. No. 23 (Messina), D.E. No. 3 (Lewen),
### D.E. No. 5 (Berrios), D.E. No. 5 (Rothman), D.E. No. 13 (Guesby),
### D.E. No. 13 (Colini), D.E. No. 19 (Smart), D.E. No. 17 (Weinger))

Plaintiffs in all of the above-captioned actions, as well as in Lewinsohn v. Humana, Inc.

(00-6138-CIV-MOORE)[1], jointly respond to the Rules to Show Cause entered in all of the

above-captioned actions as follows:

_____

[1]      Plaintiffs understand from the Court's Rules to Show Cause that it is the Court's
intention that the Lewinsohn action be transferred to this Court and that the Lewinsohn claim be
included in a consolidated amended complaint filed in Price v. Humana, Inc. (99-8763-CIV-
MORENO). As of the time of this filing, however, Plaintiffs were informed by the Office of the
Clerk for the Southern District of Florida that the Lewinsohn action had not yet been transferred
to this Court and no Rule to Show Cause had yet been entered on the docket for that action.

1.  Plaintiffs in Messina v. Humana, Inc. (99-3309-CIV-MORENO), Lewen v. Humana, Inc. (00-6130-CIV-MORENO), Berrios v. Humana, Inc. (99-6131-CIV-MORENO), Rothman v. Humana, Inc. (00-6132-CIV-MORENO), Guesby v. Humana, Inc. (00-6136-CIV-MORENO), Colini v. Humana, Inc. (00-6139-CIV-MORENO), Smart v. Humana, Inc. (00-6140-CIV-MORENO), Weinger v. Humana, Inc. (99-9108-CIV-MORENO) and Lewinsohn v. Humana, Inc. (00-6138-CIV-MOORE) do not object to dismissal of each of these actions with leave granted to amend the complaint in Price v. Humana, Inc. (99-8763-CIV-MORENO) to include each of the aforementioned causes of action.

2.  Plaintiffs in Price v. Humana Inc. (99-8763-CIV-MORENO) do not object to amending the complaint in Price v. Humana Inc. to include the aforementioned causes of action in Messina, Lewen, Berrios, Rothman, Guesby, Colini, Smart, Weinger and Lewinsohn.

3.  Plaintiffs in all of the above-captioned actions jointly propose to file a Consolidated Amended Complaint in Price v. Humana Inc. (99-8763-CIV-MORENO) in the form annexed hereto as Exhibit 1.  Plaintiffs respectfully submit that leave to amend the complaint in the Price action can be granted pursuant to Fed. R. Civ. P. 15(a), and that no interim dismissal of the Price action is necessary or warranted.

4.  Plaintiffs in all of the above-captioned actions also respectfully submit that (a) the Price Plaintiffs' Civil RICO Statement Pursuant to Local Rule 12.1 (Price D.E. No. 52), (b) the fully submitted motions pending in the Price action – including the Price Plaintiffs' Motion for Class Certification (Price D.E. Nos. 69-72, 83-88, 93-94) and Defendant Humana Inc.'s Motion to Dismiss the First Amended Complaint (Price D.E. Nos. 38-39, 63-64, 91), and (c) all orders entered by the Court in the Price action should be deemed fully applicable to the Consolidated

Amended Complaint once filed. Plaintiffs submit that this would be appropriate because (i) with

the exception of the description of the named plaintiffs in each respective action, the complaints

in all of the above-captioned actions are substantively identical in all material respects to the

First Amended Complaint in <u>Price</u>; and (ii) the Consolidated Amended Complaint annexed

hereto as Exhibit 1 is *verbatim identical* to the First Amended Complaint in <u>Price</u>, with the only

exceptions being the listings of the names of the additional plaintiffs, descriptions of those

additional plaintiffs in the "Parties" section of the Consolidated Amended Complaint, and the

listing of counsel from all of the above-captioned actions.

     5.     Counsel for the plaintiffs in all of the above-captioned actions have authorized the

filing of this Joint Response.

Dated:     March 28, 2000

Respectfully submitted

*Stephen R. Neuwirth*
David Boies
Stephen Neuwirth
BOIES, SCHILLER & FLEXNER LLP
80 Business Park Drive
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810

Michael D. Hausfeld
Joseph M. Sellers
Margaret G. Farrell
Donna Solen
COHEN, MILSTEIN,
    HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
(202) 408-4600
Fax: (202) 408-4699

Theodore J. Leopold
RICCI, HUBBARD, LEOPOLD,
    FRANKEL & FARMER PA
Mellon United National Bank Tower
1645 Palm Beach Lakes Boulevard
P.O. Box 2946
West Palm Beach, Florida 33402
(561) 684-6500
Fax: (561) 697-2383

Anne E. Hinds
Florida Bar No. 0964972
BOIES, SCHILLER & FLEXNER LLP
2435 Hollywood Boulevard
Hollywood, FL 33020-6629
(954) 929-1190
Fax:  (954) 929-1185

Albert R. Huerta
HUERTA, HASTINGS & ALLISON
920 Leopard
P.O. Box 23080
Corpus Christi, Texas 78403
(361) 884-1632
Fax:(361) 883-9092

H. Laddie Montague, Jr.
Jerome M. Marcus
Jonathan Auerbach
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
(215) 875-3000
Fax: (215) 875-4604

Andrew B. Peretz
Florida Bar No. 938599-ABP6646
BARRETT GRAVANTE
    CARPINELLO & STERN
One East Broward Blvd., Suite 620
Ft. Lauderdale, FL 33301
(954) 356-0011
Fax: (954) 356-0022

Michael Straus
BAINBRIDGE & STRAUS, L.L.P.
2210 Second Avenue North
Birmingham, AL 35203
(205) 324-3800
Fax: (205) 324-3996

Richard B. Drubel
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
(603) 643-9090
Fax: (603) 643-9010

James Fox Miller, Florida Bar No. 095070
Charles Fox Miller, Florida Bar No. 0970270
Greg A. Lewen, Florida Bar No. 0047422
MILLER, SCHWARTZ & MILLER, P.A.
2435 Hollywood Blvd
Hollywood, FL 33020
(954) 924-0300
Fax: (954) 924-0311

James W. Beasley, Jr.,
BEASLEY LEACOCK & HAUSER P.A.
Flagler Center, Suite 1400
505 S. Flagler Drive
West Palm Beach, FL 33401
(561) 835-0900
Fax: (561) 835-0939

David Krathen, Florida Bar No. 147810
LAW OFFICES OF DAVID KRATHEN P.A.
888 East Las Olas Blvd.
Suite 200
Ft. Lauderdale, FL 33301
(954) 467-6400

Of Counsel:
Robert Silver
Kent K. Anker
BOIES, SCHILLER & FLEXNER LLP
80 Business Park Drive
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the JOINT RESPONSE OF

PLAINTIFFS IN ALL ACTIONS TO RULES TO SHOW CAUSE ENTERED IN ALL

ACTIONS was served via first class U.S. mail on all those on the attached service list on March

28, 2000.

BOIES, SCHILLER & FLEXNER LLP
Attorneys for Plaintiffs
80 Business Park Drive, Suite 110
Armonk, NY 10504
(914) 273-9800
Fax: (914) 273-9810

By: _____
       Kent K. Anker

**SERVICE LIST**

Michael Straus
BAINBRIDGE & STRAUS, L.L.P.
2210 Second Ave. North
Birmingham, AL 35203

Counsel For Plaintiffs Dara R. Lewen and Donna Messina

James W. Beasley, Jr.
BEASLEY LEACOCK & HAUSER P.A.
Flagler Center, Suite 1400
505 S. Flagler Dr.
West Palm Beach, FL 33401

Counsel For Plaintiffs Alan Weinger, Cynthia Zilka and Clive D. Hayhurst

Andrew B. Peretz
BARRETT GRAVANTE CARPINELLO & STERN
One East Broward Blvd., Suite 620
Ft. Lauderdale, FL 33301

Counsel for Plaintiffs Adriana Berrios, Dara Lewen, Donna Messina and Sarah A. Rothman

H. Laddie Montague, Jr.
Jerome M. Marcus
Jonathan Auerbach
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

Counsel For Plaintiffs Alan Weinger, Cynthia Zilka and Clive D. Hayhurst

David Krathen
LAW OFFICES OF DAVID KRATHEN P.A.
888 East Las Olas Blvd.
Suite 200
Ft. Lauderdale, FL 33301

Counsel For Plaintiffs Alan Weinger, Cynthia Zilka and Clive D. Hayhurst

James Fox Miller
Charles Fox Miller
Greg A. Lewen
MILLER, SCHWARTZ & MILLER, P.A.
2435 Hollywood Blvd.
Hollywood, FL 33020

Counsel for Plaintiffs Ailene Colini, Robert L. Guesby, Maureen Lewinsohn and Susan K. Smart

Henry N. Adorno
Raoul G. Cantero, III
ADORNO & ZEDER P.A.
2601 South Bayshore Drive, Suite 1600
Miami, Florida 33133

Counsel for Defendant Humana Inc.

Peter A. Sachs
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
505 South Flagler Drive, Suite 1100
Post Office Box 3475
West Palm Beach, FL 33402-3475

Counsel for Defendant Humana Inc.

Linda J. Smith
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Counsel for Defendant Humana Inc.

Ira H. Raphaelson
Brian D. Boyle
Robert N. Eccles
John H. Beisner
Brian P. Brooks
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C. 20004

Counsel for Defendant Humana Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA    ATTACHMENT / EXHIBIT ____
MIAMI DIVISION

REGINA JOI PRICE, ANTHONY SESSA,
REY GARCIA, KATHERINE FRISCO,
RAMON ORTIZ ROSARIO,
EMILY M. BROWN,  ARNOLD KATZ,
DAWN YINGLING, ADRIANA BERRIOS,
AILENE COLINI, ROBERT L. GUESBY,
CLIVE D. HAYHURST,
DARA R. LEWEN, MAUREEN LEWINSOHN,
DONNA MESSINA, SARAH A. ROTHMAN,
SUSAN K. SMART, ALAN WEINGER,
and CYNTHIA ZILKA,
on behalf of themselves
and all others
similarly situated

        Plaintiffs,

v.

HUMANA INC.,

        Defendant.

_____/

**Case No. 99-8763 CIV-MORENO**
**Magistrate Judge Robert L. Dube**

**JURY TRIAL**
**DEMANDED**

**CONSOLIDATED**
**AMENDED**
**COMPLAINT-**
**CLASS ACTION**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 5 |
| II. | JURISDICTION AND VENUE | 7 |
| III. | PLAINTIFFS | 8 |
| IV. | DEFENDANT | 33 |
| V. | DEFINITIONS | 38 |
| VI. | CLASS ACTION ALLEGATIONS | 40 |
| VII. | FACTUAL BACKGROUND COMMON TO ALL CLAIMS | 46 |
| | A. Humana's National Health Care Network | 46 |
| | B. The State and Local Health Care Networks | 50 |
| | C. Categories of Health Plans Offered by Humana to Members of the Classes | 54 |
| | D. Disclosures by Humana to Class Members | 55 |
| | E. Humana's Fraudulent Omissions to the Classes | 56 |
| | F. Humana's Material Misrepresentations to the Classes | 60 |
| | G. Humana Takes Actions that are Inconsistent with the Interests of the Classes | 64 |
| | H. Humana Operates its Network to Implement and Promote Its Wrongful Scheme | 67 |
| | I. Harm to the Classes | 70 |
| VIII. | COUNT ONE (Violation of RICO, 18 U.S.C. § 1961 et seq.) | 71 |
| | A. Overview of RICO Claim | 71 |
| | B. Pattern of Racketeering Activity | 73 |

C.    The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

      (1) The National Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

      (2) The State and Local Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

D.    Relationship Between the Pattern Racketeering Activity and the Enterprise . . . 81

E.    Reliance of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

F.    Benefits of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

G.    Effects on Interstate Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

H.    Direct Injury and Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

IX.    COUNT TWO (Breach of Disclosure Obligations Under ERISA) . . . . . . . . . . . . . . . . 85

X.    COUNT THREE (Breach of Fiduciary Duty Under ERISA) . . . . . . . . . . . . . . . . . . . . 88

A.    The Duty of Loyalty- ERISA Section 104(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . 88

B.    Duty to Discharge Responsibilities in Accordance with Plan . . . . . . . . . . . . . . 89

      Documents -- Section 104(a)(1)(D) of ERISA

C.    Duty to Discharge Duties With Care, Skill and Prudence Section 104(a)(1)(B) . 90

D.    Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XI.    COUNT FOUR (Failure to Provide Benefits Due Under ERISA Plans) . . . . . . . . . . . 91

XII.    COUNT FIVE (Breach of Fiduciary Duty by Failure to Disclose Incentives Imposed on

Physicians) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

XIII.    DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

1.     Regina Joi Price, Anthony Sessa, Rey Garcia, Katherine Nicole Frisco, Ramon

Ortiz Rosario, Emily M. Brown, Arnold Katz,  Dawn Yingling, Adriana Berrios, Ailene Colini,

Robert L. Guesby, Clive D. Hayhurst, Dara R. Lewen, Maureen Lewinsohn, Donna Messina,

Sarah A. Rothman, Susan K. Smart, Alan Weinger, and Cynthia Zilka ("RICO Plaintiffs"), by

and through their undersigned attorneys, bring this action individually and as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek treble damages

under the Racketeer-Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961-1968,

on behalf of themselves and a class ("the RICO Class") consisting of all persons in the United

States who purchased or participated (as defined herein) in health maintenance organizations

("HMOs") preferred provider organizations ("PPOs") and/or point of service plans ("POSs"),

operated by Defendant Humana, Inc. at any time during the period from October 4, 1995 through

and after the date hereof until Humana's continuing illegal and wrongful conduct has ceased  (the

"RICO Class Period").

2.     Ramon Ortiz Rosario,  Katherine Nicole Frisco,  Emily M. Brown, Arnold Katz,

Dawn Yingling, Donna Messina, Alan Weinger, and Cynthia Zilka ("ERISA Plaintiffs") also

bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all persons who participated in Humana Health

Plans through their employers' ERISA-governed health benefits plans during the period from

October 4, 1993 through and after the date hereof until Humana's continuing illegal and

wrongful conduct has ceased ("the ERISA Class Period") . The ERISA Plaintiffs seek coverage-

benefits denied by defendant, and restitutionary, injunctive and/or other equitable relief under the

Employee Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C.§§ 1001-1169.

3.      The RICO Class consists of all persons who purchased their Humana coverage during the RICO Class Period, not including persons insured by Medicare or Medicaid ("the RICO Class"). The ERISA Class consists of all persons who participated in their Humana coverage through their employers' ERISA-governed health benefits plans ("Benefit Plans"). Plaintiffs allege the following upon information and belief, except as to paragraph 17, pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge.

## I.  INTRODUCTION

4.      This case arises from Defendant Humana's systematic and intentional concealment from members in its Health Plans of accurate information about when health care claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of their coverage.

5.      At issue in this action is whether Humana is liable under existing federal law for, among other things, repeated and continuing fraudulent conduct involving material misrepresentations and misleading omissions in disclosures to Class Members. This action does not challenge the legitimacy or wisdom of "managed care" as a means of delivering health services in the United States.

6.      Humana concealed from Class Members that it has established a set of financial incentives for claims reviewers – including direct cash bonus payments – designed to encourage denial of claims without regard to the medical needs of patients. Indeed, *Humana's incentives encouraged claims reviewers to deny claims or limit hospital admissions regardless whether*

5

*such claims or admissions satisfied the medical necessity criteria set forth in Humana's Health Plan documents.*

7.    Humana consistently told Class Members that coverage and treatment decisions under Humana policies will be made on the basis of "medical necessity." Contrary to these representations, however, Humana did not provide coverage or review claims solely, or sometimes at all, on the basis of medical necessity, as described to Class Members. Instead, as detailed below, Humana treatment and coverage determinations took account of a variety of concealed cost-based criteria that were different from, and sometimes inimical to, the medical needs of Class Members ("Undisclosed Cost-Based Criteria").

8.    Humana also concealed from Class Members that, in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Class Members' medical coverage – to third parties. These third parties have based claim approval decisions, in whole or in part, on undisclosed criteria that are in addition to, and sometimes wholly unrelated to, medical necessity.

9.    Humana also concealed from Class Members that Humana provides direct financial incentives to physicians, including, without limitation, capitated payment arrangements, that are intended to reduce the amount of care provided to Class Members, regardless of medical necessity.

10.    In addition, Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations. Humana thus failed to inform the

6

Class that decisions respecting medical necessity would be made by persons without the appropriate medical experience or training to recognize medical necessity.

11.    By means of the affirmative misrepresentations and omissions described more fully below, Humana intended to and did provide Plaintiffs and the Classes they represent with health insurance benefits of lesser value than promised. Humana unjustly enriched itself by millions of dollars at the Classes' expense.

12.    As set forth in detail below, Humana's conduct constituted a pattern of racketeering activity as defined in the Racketeer-Influenced and Corrupt Organizations Act (RICO), and is actionable under RICO. Plaintiffs and the RICO Class thus seek treble damages for the injuries to their property and business that they have sustained as a direct and proximate result of Defendant Humana's unlawful conduct.

13.    As also set forth below, Defendant Humana has violated the disclosure provisions of ERISA, wrongfully denied coverage-benefits, and has breached the fiduciary duties it owes to ERISA Class Members. Pursuant to ERISA, Plaintiffs Ramon Ortiz Rosario, Katherine Nicole Frisco, Emily M. Brown, Arnold Katz, Dawn Yingling, Donna Messina, Alan Weinger, Cynthia Zilka and the ERISA Class thus seek both (a) recovery of benefits according to the terms of their plans and (b) equitable relief, including corrective disclosures, as provided by ERISA.

## II. JURISDICTION AND VENUE

14.    This action is brought to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, for the injuries sustained by Plaintiffs and RICO Class Members resulting from violations by the Defendant, as hereinafter alleged, of RICO, 18 U.S.C. §§

1964(c) and 1962(c).  This Court has subject matter jurisdiction over the claims of Plaintiffs and

the RICO Class pursuant to 18 U.S.C. § 1964 and 29 U.S.C.§ 1331.

15.    This action is also brought under § 502 of ERISA, 29 U.S.C. § 1132 for recovery

of coverage-benefits, injunctive and other equitable relief.  This Court has subject matter

jurisdiction over the claims of the Plaintiffs and the ERISA Class pursuant to § 502(e)(1) of

ERISA, 29 USC §1132(e)(1).

16.    The activities alleged in this Complaint were carried out, in part, within this

District, and the Defendant conducts business within this District, in part, the interstate trade and

commerce hereinafter described.  Venue is appropriate.

### III. PLAINTIFFS

17.    (1)    Plaintiff Regina Joi Price is a resident of Palm Beach County, Florida.  At

all times relevant hereto, Ms. Price was a member of a Humana Health Plan arranged through her

employer, the City of Riviera Beach.

(a)    Ms. Price became employed by the City of Riviera Beach (CRB) on or

about January 6, 1986 as a police officer, and currently holds the rank of sergeant.  Ms. Price was

offered health insurance coverage, in addition to her salary, as compensation for her services.

CRB arranged for its employees to obtain health benefits only from Humana.  CRB did not

arrange for its employees to purchase health benefits from any other insurance company.

(b)    During the relevant period, CRB offered Ms. Price a choice between two

different Humana plans, an HMO and a PPO.  She first chose the Humana HMO, in 1986, and

later switched to the Humana PPO after her son was denied emergency care.  During her

8

employment by CRB, Ms. Price has paid for her Humana coverage with the value of her services and with salary deductions of approximately $80 a week.

        (c)      In 1986, when Ms. Price became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Price that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage, and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Price has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Price continued and paid for her enrollment in Humana in subsequent years.

        (d)      After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Price realized that the coverage she actually had purchased from Humana is not as valuable as the coverage Humana represented to her.

        (e)      Ms. Price continues to be an enrollee of the Humana Health Plan because

9

her employer does not offer any other health insurance coverage as part of the agreed amount of compensation for her employment.

(2)     Plaintiff Richard Anthony Sessa is a resident of Palm Beach County, Florida, who at all times relevant hereto, was a member of a Humana Health Plan through his employer, the City of Riviera Beach.

(a)     Mr. Sessa became employed by the City of Riviera Beach (CRB) as a police officer on or about January 6, 1986. Mr. Sessa was offered health insurance coverage, in addition to salary, as compensation for his services. CRB offered its employees health benefits insured only by Humana. CRB did not offer to its employees health benefits coverage by any other insurance companies.

(b)     During the relevant period, Mr. Sessa was offered a choice between two different Humana plans, an HMO and a PPO. At the time of his employment, in 1986, Mr. Sessa enrolled in the Humana HMO. Since the time of his enrollment in Humana, Mr. Sessa has paid for his Humana coverage with the value of his services to CRB and salary deductions of approximately $30 a week. At this time, Mr. Sessa can obtain employer-sponsored health benefit coverage only from Humana.

(c)     In 1986, when he became a member in the Humana Plan, Mr. Sessa was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under his Humana Health Plan would be provided when his medical claims satisfied the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. Concealed from Mr. Sessa was the fact that Humana actually used additional, more

10

restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage, and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Sessa has not received notice from Humana that his coverage has changed. On the basis of the information about his benefit coverage, Mr. Sessa continued to enroll and pay for membership in Humana's HMO plan in subsequent years.

(d)     After being informed of the misrepresentations and omissions by Humana, Mr. Sessa realized that the coverage he purchased from Humana is not as valuable to him as the coverage Humana had represented to him.

(e)     Mr. Sessa continues to be an enrollee of the Humana Health Plan because his employer has not arranged to provide any other health insurance coverage as part of the agreed amount of compensation for his employment.

(3)     Plaintiff Rey Garcia is a resident of Nueces County, Texas, who at all times relevant hereto, was a member of a Humana Health Plan arranged through his employer, the United States Postal Service (USPS).

(a)     Mr. Garcia became employed by USPS on or about February 10, 1979. Mr. Garcia was offered health insurance coverage, in addition to his salary, as compensation for his services. USPS arranged for its employees to select from three or four health maintenance

11

organizations to provide health benefits.

(b)     Mr. Garcia enrolled in a Humana HMO on or about January 13, 1990. During his employment by USPS, Mr. Garcia has paid for his Humana coverage with the value of his services and salary deductions of approximately $6.38 a week.

(c)     In 1990, when Mr. Garcia became a participant in the Humana Plan, he was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under his Humana Health Plan would be provided when his medical claim satisfies the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. The description of benefits concealed from Mr. Garcia that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Garcia has not received notice from Humana that his coverage has changed. On the basis of the information provided by Humana about his benefit coverage, Mr. Garcia continued and paid for his enrollment in Humana in subsequent years.

(d)     After being informed of misrepresentations and omissions by Humana described in the preceding paragraph, Mr. Garcia realized that the coverage he actually had

12

purchased from Humana is not as valuable to him as the coverage Humana represented to him.

(e)    Mr. Garcia continues to be an enrollee of the Humana HMO but plans to disenroll at the beginning of next year when his contract with Humana terminates.

(4)    Plaintiff Katherine Nicole Frisco is a resident of Nueces County, Texas, who at all times relevant hereto was a member of a Humana Health Plan arranged through her employer, Huerta, Hastings & Allison, L.L.P..

(a)    Ms. Frisco became employed by Huerta, Hastings & Allison, L.L.P. (HHA) on or about June 1994. Ms. Frisco was offered health insurance coverage, in addition to her salary, as compensation for her services. HHA arranged for its employees to obtain health benefits only from Humana. HHA did not offer its employees health benefits from any other insurance companies.

(b)    Ms. Frisco enrolled in a Humana PPO on or about September 1994. During her employment by HHA, Ms. Frisco paid for her Humana coverage with the value of her services and salary deductions of approximately $38 a week. Ms. Frisco's PPO was an employer-sponsored, ERISA-governed employee benefit plan and was offered, in addition to salary, as compensation for her services.

(c)    In 1994, when Ms. Frisco became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Frisco that Humana

13

actually used additional, more restrictive standards to determine when coverage would be approved and provided.  For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions.  During the time of her enrollment in Humana, Ms. Frisco received no notice from Humana that her coverage had changed.  On the basis of the information provided by Humana about her benefit coverage, Ms. Frisco continued and paid for her enrollment in Humana in subsequent years.

(d)    After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Frisco realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(e)    Ms. Frisco discontinued her employment with HHA in May 1998 and her enrollment in the Humana Health Plan terminated on or about September 1998.

(5)    Ramon Ortiz Rosario is a resident of Palm Beach County who at all times relevant hereto, was a member of a Humana Health Plan arranged through his employer, Nical of Palm Beach, Inc. (Nical) (formerly known as Scott Lewis Gardening and Trimming )

(a)    Mr. Rosario became an employee of Scott Lewis Gardening and Trimming Inc. in or about January of 1987.  He currently holds the position of the trimming supervisor with Nical.  Mr. Rosario's Humana HMO is an employer-sponsored, ERISA-governed employee

14

welfare plan and was offered, in addition to his salary, as compensation for his services. His employer arranged for its employees to obtain health benefits only from Humana and did not arrange for its employees to purchase health benefits from any other insurance company since on or about September 15, 1995.

(b)     Mr. Rosario has paid for his Humana coverage with the value of his services and with salary deductions of approximately $20.52 a week.

(c)     Shortly after he became a member in the Humana Plan, Mr. Rosario received a description of benefits from Humana, which represented, among other things, that claims under his Humana Health Plan would be evaluated under Humana's Medical Necessity Definition. The description of benefits concealed from Mr. Rosario that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives for physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Rosario has not received notice from Humana that his coverage has changed. Mr. Rosario enrolled and continued to pay for membership in the Humana HMO on the basis of the information provided to him about his benefit coverage.

(d)     After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Mr. Rosario realized that the coverage he had purchased

15

from Humana is not as valuable to him as the coverage represented in Humana's documents.

(e)    Mr. Rosario continues to be an enrollee of the Humana HMO because his employer has not arranged to provide any other health insurance coverage.

(6)    Emily M. Brown is a resident of Alexandria, Virginia. From the beginning of the ERISA and RICO Class Periods through the end of 1996, Ms. Brown was a member of a Humana Health Plan arranged through her employer, Divorce and Marital Stress Clinic, Inc, trading as Key Bridge Therapy and Mediation Center. During her employment with Key Bridge Therapy and Mediation Center, Ms. Brown paid her Humana coverage with salary deductions of approximately $175 per month.

(a)    Ms. Brown's Humana Health Plan was an employer-sponsored, ERISA-governed employee welfare plan offered by Key Bridge Therapy and Mediation Center.

(b)    Key Bridge Therapy and Mediation Center did not offer its employees health benefits coverage by any other insurance companies.

(c)    When Ms. Brown became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Brown that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers

16

to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Brown has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Brown continued and paid for her enrollment in Humana.

(d)    After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Brown realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(e)    Ms. Brown was dissatisfied with her Humana coverage and discontinued her Humana Health Plan at the end of 1996.

(7)    Arnold Katz is a resident of Broward County, Florida. From on or about 1995 to the present, Mr. Katz has been a member of a Humana Health Plan arranged through his employer, Vencor Hospital.

(a)    Mr. Katz became employed by Vencor Hospital in or about 1995 as a respiratory therapist supervisor. Mr. Katz's Humana Health Plan is an employer-sponsored, ERISA-governed employee welfare plan offered by Vencor Hospital. Mr Katz was offered health insurance coverage, in addition to his salary, as compensation for his services. Vencor Hospital arranged for its employees to obtain health benefits only from Humana. Vencor Hospital did not arrange for its employees to purchase health benefits from any other insurance company.

17

(b)    During the relevant period, Vencor Hospital offered Mr. Katz the choice between two different Humana plans, an HMO and a PPO. Mr. Katz chose the Humana PPO plan. During his employment with Vencor Hospital, Mr. Katz has paid for his Humana coverage with the value of his services and with salary deductions of approximately $56 per two weeks.

(c)    When Mr. Katz became a participant in the Humana Plan, he was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when his medical claim satisfies the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. The description of benefits concealed from Mr. Katz that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Katz has not received notice from Humana that his coverage has changed. On the basis of the information provided by Humana about his benefit coverage, Mr. Katz continued and paid for his enrollment in Humana.

(d)    After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Mr. Katz realized that the coverage he actually had purchased from Humana is not as valuable as the coverage Humana represented to him.

18

(e)    Mr. Katz continues to be an enrollee of the Humana Health Plan because his employer does not offer any other health insurance coverage as part of the agreed amount of compensation for his employment.

(8)    Plaintiff Dawn Yingling is a resident of Anderson, Madison County, Indiana, who at all times relevant hereto was a member of a Humana Health Plan arranged through her employer, New Horizons, Computer Learning Centers, Inc.

(a)    Ms Yingling became an employee of New Horizons in May 1998. Ms Yingling was offered health insurance coverage, in addition to her salary, as compensation for her services. Ms. Yingling's Humana Health Plan is an employer-sponsored, ERISA-governed employee welfare plan offered by New Horizons. New Horizons arranged for its employees to obtain health benefits only from Humana. New Horizons did not offer its employees health benefits from any other insurance companies.

(b)    Ms Yingling enrolled in a Humana PPO on or about June 1998. During her employment by New Horizons, Ms. Yingling paid for her Humana coverage with the value of her services and salary deductions.

(c)    When Ms Yingling became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms.Yingling that Humana actually used additional, more restrictive standards to determine when coverage would be approved and

19

provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. During the time of her enrollment in Humana, Ms Yingling has received no notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Yingling continued and paid for her enrollment in Humana in subsequent years.

(d)     In November 1998, Ms Yingling's physician ordered blood tests be conducted to diagnose a suspected blood clotting disorder, a condition from which her mother had died at the age of 23. Humana denied a claim for the tests stating that "the lab tests were determined to not be medically necessary". After Ms Yingling complained to the Indiana Department of Insurance, Humana partially paid Ms Yingling's claim.

(e)     After being informed of the misrepresentations and omissions by Humana described in subparagraph (8)(c) of this paragraph, Ms Yingling realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(f)     Ms. Yingling continues to be an enrollee of the Humana PPO because her employer has not arranged to provide any other health insurance coverage.

(9)     Plaintiff Adriana Berrios is a resident of Broward County, Florida. At all

20

times relevant hereto, Adriana Berrios was a member of a Humana Health Plan arranged through her employer, Broward County School Board ("Broward County").

      (a)    Adriana Berrios became employed by Broward County on or about October 1979 as a Secretary. Adriana Berrios was offered health insurance coverage, in addition to her salary, as compensation for her services.

      (b)    During the relevant period, Broward County offered Ms. Berrios a choice between two different Humana plans, an HMO and a PPO. She chose the Humana HMO. During her employment by Broward County, Ms. Berrios has paid for her Humana coverage with the value of her services.

      (c)    In 1979, when Adriana Berrios became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under the Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Adriana Berrios that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Berrios has not received notice from Humana that her coverage has changed. On

21

the basis of the information provided by Humana about her coverage, Ms. Berrios continued and paid for her enrollment in Humana in the subsequent year.

(d)     After being informed of these Humana utilization management standards and procedures described in the preceding paragraph, Adriana Berrios realized that the coverage she actually had purchased from Humana is not as valuable to her as the coverage Humana represented to her.

(10)     Plaintiff Ailene Colini is a resident of Broward County, Florida. At all times relevant hereto, Ailene Colini was a member of a Humana Health Plan arranged through her employer, Broward County School Board.

(a)     Ailene Colini became employed by Broward County School Board on or about April 1993 as a secretary. Ailene Colini was offered health insurance coverage, in addition to her salary, as compensation for her services.

(b)     During the relevant period, Broward County School Board offered Ms. Colini a choice between two different Humana plans, an HMO and a PPO, in addition to other health insurance choices. Upon reliance of what Ms. Colini believed Humana offered, she chose the Humana HMO. During her employment by the Broward County School Board, Ms. Colini has paid for her Humana coverage with the value of her services.

(c)     In or about 1993, when Ailene Colini became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure

22

Documents. The description of benefits concealed from Ailene Colini that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created undisclosed claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Colini has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Colini continued and paid for her enrollment in Humana in the subsequent year.

        (d)     After being informed of these Humana utilization managements standards and procedures described in the preceding paragraph Ailene Colini realized that the coverage she actually had purchased from Humana is not as valuable as the coverage Humana represented to her.

        (11)    Plaintiff Robert L. Guesby is a resident of Broward County, Florida. At all times relevant hereto, Robert L. Guesby was a member of a Humana Health Plan arranged through his employer, Broward County School Board.

        (a)     Robert L. Guesby became employed by Broward County School Board on or about 1984 as a Guidance Counselor, and later as a Guidance Director. Robert L. Guesby was offered health insurance coverage, in addition to his salary, as compensation for his services.

        (b)     During the relevant period, Broward County School Board offered

Mr. Guesby a choice between two different Humana plans, an HMO and a PPO, in addition to other health insurance choices. Upon reliance of what Mr. Guesby believed Humana offered, he chose the Humana HMO. During his employment by the Broward County School Board, Mr. Guesby has paid for his Humana coverage with the value of his services, in addition to income withdrawals for coverage for his daughter.

(c)     In or about 1984, when Robert L. Guesby became a participant in the Humana plan, he was supplied a description of the benefits by Humana, which represented, among other things, that coverage under his Humana Health Plan would be provided when his medical claims satisfied the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. The description of benefits concealed from Robert L. Guesby that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Guesby has not received notice from Humana that his coverage has changed. On the basis of the information provided by Humana about his benefit coverage, Mr. Guesby continued and paid for his enrollment in Human in the subsequent year.

(d)     After being informed of these Humana utilization managements standards and procedures described in the preceding paragraph Robert L. Guesby realized that the coverage

he actually had purchased from Humana is not as valuable as the coverage Humana represented to him.

(12)    Plaintiff Clive D. Hayhurst is a resident of Broward County, Florida. At all times relevant hereto, Clive D. Hayhurst was a member of a Humana Health Plan arranged through his employer, Broward County Sheriff's Office (BSO). Plaintiff Clive D. Hayhurst became employed by BSO in or about 1981, as a Deputy Sheriff. Plaintiff retired from BSO in November of 1997. Plaintiff Clive D. Hayhurst was offered health insurance coverage, in addition to his salary, as compensation for his services. In or around 1985, BSO switched carriers for its employee coverage to Humana. BSO arranged at that time for its employees to obtain health benefits only from Humana. BSO did not arrange for its employees to purchase health benefits from any other insurance company.

(13)    Plaintiff Dara R. Lewen is a resident of Broward County, Florida. At all times relevant hereto, Dara R. Lewen was a member of a Humana Health Plan arranged through her employer, Broward County School Board ("Broward County").

(a)    Dara R. Lewen became employed by Broward County on or about August 1992 as a Guidance Counselor. Dara R. Lewen was offered health insurance coverage, in addition to her salary, as compensation for her services.

(b)    During the relevant period, Broward County offered Ms. Lewen a choice between two different Humana plans, an HMO and a PPO. She chose the Humana PPO. During her employment by Broward County, Ms. Lewen has paid for her Humana coverage with the value of her services and with salary deductions of approximately $200 up to more than $500 a

25

month.

(c)    In 1992, when Dara R. Lewen became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents.  The description of benefits concealed from Dara R. Lewen that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided.  For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions.  Since the time of her enrollment in Humana, Ms. Lewen has not received notice from Humana that her coverage has changed.  On the basis of the information provided by Humana about her benefit coverage, Ms. Lewen continued and paid for her enrollment in Humana in the subsequent year.

(d)    After being informed of these Humana utilization management standards and procedures described in the preceding paragraph, Dara R. Lewen realized that the coverage she actually had /purchased from Humana is not as valuable to her as the coverage Humana represented to her.

(14) Plaintiff Maureen Lewinsohn is a resident of Broward County, Florida.  At all times relevant hereto, Maureen Lewinsohn was a member of a Humana Health Plan arranged

26

through her employer, Broward County School Board.

(a)     Maureen Lewinsohn became employed by Broward County School Board on or about August 1979 as an educator, and most recently as an ESE Specialist. Maureen Lewinsohn was offered health insurance coverage, in addition to her salary, as compensation for her services.

(b)     During the relevant period, Broward County School Board offered Ms. Lewinsohn a choice between two different Humana plans, an HMO and a PPO, in addition to other health insurance choices. Upon reliance of what Ms. Lewinsohn believed Humana offered, she chose the Humana PPO. During her employment by the Broward County School Board, Ms Lewinsohn paid for her Humana coverage with the value of her services.

(c)     In or about 1993, when Maureen Lewinsohn became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Maureen Lewinsohn that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions.

27

Since the time of her enrollment in Humana, Ms. Lewinsohn has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Lewinsohn continued and paid for her enrollment in Humana in the subsequent year.

      (d)      After being informed of these Humana utilization managements standards and procedures described in the preceding paragraph Maureen Lewinsohn realized that the coverage she actually had purchased from Humana is not as valuable as the coverage Humana represented to her.

      (15)      Plaintiff Donna Messina is a resident of Broward County, Florida. At all times relevant hereto, Donna Messina was a member of a Humana Health Plan arranged through her employer, Barrett Gravante Carpinello & Stern L.L.P. ("BGCS")

      (a)      Donna Messina became employed by BGCS on or about January 30, 1998 as a Law Clerk and Office Manager. Donna Messina was offered health insurance coverage, in addition to her salary, as compensation for her services.

      (b)      During the relevant period BGCS offered Ms. Messina a choice between two different Humana plans, an HMO and a PPO. She chose the Humana PPO. During her employment by BGCS, Ms. Messina has paid for her coverage with the value of her services and with salary deductions of approximately $50 a week.

      (c)      In 1998, when Donna Messina became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims

28

satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Donna Messina that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claim review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Messina has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Messina continued and paid for her enrollment in Humana in the subsequent year.

      (d)    After being informed of these Humana utilization management standards and procedures described in the preceding paragraph, Donna Messina realized that the coverage she had actually purchased from Humana is not as valuable to her as the coverage Humana represented to her.

      (16)    Plaintiff Sarah Alexandra Rothman is a resident of Broward County, Florida. At all times relevant hereto, Sarah Alexandra Rothman was a member of a Humana Health Plan arranged through her employer, Broward County School Board ("Broward County").

      (a)    Sarah Alexandra Rothman became employed by Broward County on or about October 1996 as a Guidance Counselor. Sarah Alexandra Rothman was offered health insurance coverage, in addition to her salary, as compensation for her services.

(b)    During the relevant period, Broward County offered Ms. Rothman a choice between two different Humana plans, an HMO and a PPO.  She chose the Humana HMO. During her employment by Broward County, Ms. Rothman has paid for her Humana coverage with the value of her services.

(c)    In 1996, when Sarah Alexandra Rothman became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents.  The description of benefits concealed from Sarah Alexandra Rothman that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided.  For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Rothman has not received notice from Humana that her coverage has changed.  On the basis of the information provided by Humana about her benefit coverage, Ms. Rothman continued and paid for her enrollment in Humana in the subsequent year.

(d)    After being informed of these Humana utilization management standards and procedures described in the preceding paragraph, Sarah Alexandra Rothman realized that the

30

coverage she actually had purchased from Humana is not as valuable to her as the coverage Humana represented to her.

(17)    Plaintiff Susan Kay Smart is a resident of Broward County, Florida.  At all times relevant hereto, Susan Kay Smart was a member of a Humana Health Plan arranged through her  employer, Broward County School Board.

(a)    Susan Kay Smart became employed by Broward County School Board on or about August 1993 as a teacher, and in other instructional positions.  Susan Kay Smart was offered health insurance coverage, in addition to her salary, as compensation for her services.

(b)    During the relevant period, Broward County School Board offered Ms. Smart a choice between two different Humana plans, an HMO and a PPO, in addition to other health insurance choices.  Upon reliance of what Ms. Smart believed Humana offered, she chose the Humana PPO.  During her employment by the Broward County School Board, Ms. Smart has paid for her Humana coverage with the value of her services, in addition to income withdrawals for coverage for her family.

(c)    In or about 1993, when Susan Kay Smart became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents.  The description of benefits concealed from Susan Kay Smart that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided.  For example, and without limitation, Humana used Undisclosed

31

Cost-Based Criteria to make coverage and treatment decisions; created claim denial incentives to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other healthcare professionals; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Smart has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Smart continued and paid for her enrollment in Humana in the subsequent year.

       (d)     After being informed of these Humana utilization managements standards and procedures described in the preceding paragraph Susan Kay Smart realized that the coverage she actually had purchased from Humana is not as valuable as the coverage Humana represented to her.

       (18)    Plaintiff Alan Weinger is a resident of Broward County, Florida. At all times relevant hereto, Alan Weinger was a member of Humana Health Plan arranged through his employer, the Dial Realty Corporation. Plaintiff Alan Weinger became employed by the Dial Realty Corporation on or about October 29, 1996 as President of the company and currently is still the President of the company. Plaintiff Alan Weinger was offered health insurance coverage, in addition to his salary, as compensation for his services. Dial Realty Corporation arranged for its employees to obtain health benefits only from Humana. Dial Realty Corporation did not arrange for its employees to purchase health benefits from any other insurance company.

       (19)    Plaintiff Cynthia Zilka is a resident of Broward County, Florida. At all times relevant hereto, Cynthia Zilka was a member of a Humana Health Plan arranged through

her employer, Security Link. Plaintiff Cynthia Zilka became employed by Security Link on or about June of 1997 as a Sales Representative and currently is a Sales Representative. Plaintiff Cynthia Zilka was offered health insurance coverage, in addition to her salary, as compensation for her services. Security Link arranged for its employees to obtain health benefits only from Humana. Security Link did not arrange for its employees to purchase health benefits from any other insurance company.

## IV. DEFENDANT

18.    Defendant, Humana Inc. is a Delaware corporation with corporate headquarters in Louisville, Kentucky. Humana is traded on the New York Stock Exchange.

19.    The majority of Humana's membership is located in 15 states: Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming. Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above), Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.

20.    · Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million persons annually. The Company operates health maintenance organizations (HMOs), preferred provider organizations (PPOs) and point of services plans (POSs) that encourage or require the use of providers who have contracted with

Humana. Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

    21.    Humana Inc. is the parent corporation of the following subsidiaries that provide underwriting and health care services, including without limitation:

    (i)    Humana Health Plans of Alabama, Inc.;

    (j)    QuestCare, Inc.;

    (k)    Centerstone Insurance and Financial Services Inc. and West Coast Multiple Servs, Inc.

    (l)    Centerstone Holding Corporation;

    (m)    EMPHESYS Financial Group, Inc.;

    (n)    Health Value Management, Inc.;

    (o)    Humana HealthChicago, Inc.;

    (p)    Humana Inc. d/b/a H.A.C. Inc. and Humana of Delaware, Inc.;

    (q)    Humana Military Healthcare Services, Inc., d/b/a Humana Military Health Services, Inc.;

    (r)    Medstep, Inc.;

    (s)    Physician Corporation of America;

    (t)    Delray Beach Health Management Associates, Inc., d/b/a Humana Health Care Plans - Delray;

    (u)    Family Health Plan Administrators, Inc.;

    (v)    Health Inclusive Plan of Florida, Inc., d/b/a Humana Health Care Plans -

Century Village Palm Beach;

(w)  Humana Health Care Plans - Davie, Inc., f/k/a Coastal Physician Group of South Davie, Inc.;

(x)  Humana Health Care Plans - Palm Springs, Inc. f/k/a Coastal Managed Care of Lake Worth, Inc.;

(y)  Humana Health Care Plans - Rolling Hills, Inc., f/k/a Coastal Physician Group of North Davie, Inc.;

(z)  Humana Health Care Plans - South Pembroke Pines, Inc. f/k/a Coastal Physician Group of Pembroke Pines, Inc.;

(aa)  Humana Health Care Plans - West Palm Beach, Inc. f/k/a Coastal Managed Care of West Palm Beach, Inc.;

(bb)  Humana Internal Medicine Associates, Inc. f/k/a Coastal Internal Medicine Associates of Dade, Inc., d/b/a: (1) Humana Health Care Plans - Hialeah f/k/a Coastal Internal Medicine Associates of Hialeah; (2) Humana Health Care Plans - South Miami f/k/a Coastal Internal Medicine Associates of Larkin; (3) Humana Health Care Plans- Miami, f/k/a Coastal Internal Medicine Associates of Miami; (4) Humana Health Care Plans - Miami Beach f/k/a Coastal Internal Medicine Associates of Miami Beach, (5) Humana Health Care Plans- Royal Oaks f/k/a Coastal Internal Medicine Associates of Miami Lakes; (6) Humana Health Care Plans - Miami Springs f/k/a Coastal Internal Medicine Associates of Miami Springs; (7)

35

Humana Health Care Plans - Midway f/k/a Coastal Internal Medicine Associates of Midway; (8) Humana Health Care Plans - Boca Raton; (9) Humana Health Care Plans -Delray Harbor; (10) Humana Health Care Plans - Lantana; (11) Humana Health Care Plans - Palm Beach Gardens; (12) Humana Health Care Plans - Tamarac; and (13) Humana Health Care Plans - West Boca.

(cc) Humana Internal Medicine Associates of the Palm Beaches, Inc. f/k/a Coastal Internal Medicine Associates of the Palm Beaches, Inc., d/b/a: (1) Humana Health Care Plans - Lake Worth f/k/a Coastal Internal Medicine Associates of JFK Circle; (2) Humana Health Care Plans - Flagler f/k/a Coastal Internal Medicine Associates of Northern Dixie Highway; (3) Humana Health Care Plans - Riverbridge f/k/a Coastal Internal Medicine Associates at Riverbridge; (4) Humana Health Care Plans - Palm Beach f/k/a Coastal Internal Medicine Associates of South Dixie Highway; (5) Humana Health Care Plans - Boynton Beach;

(dd) Humana Health Insurance Company of Florida, Inc.;

(ee) Humana Medical Plan, Inc., d/b/a: (1) Coastal Pediatrics -Daytona; (2) Coastal Pediatrics - Port Orange; (3) Coastal Pediatric - Ormond; (4) Daytona Gastroenterology; (5) Flagler Family Practice; (6) Florida Dermatology Center; (7) Humana Medical Plan - West Palm Beach; (8) Internal medicine of Daytona; (9) Orange Park Family Health Care; (10)

St. Augustine Family Health Center; and (11) Suncoast Medical

Associates;

(ff)    Lakeside Medical Center Management, Inc., d/b/a University Medical

Center;

(gg)    PCA Options, Inc.;

(hh)    Humana Employers Health Plan of Georgia, Inc., f/k/a EMPHASES

Healthcare of Georgia, Inc.;

(ii)    Humana Health Direct, Inc., d/b/a Behavioral Health Direct;

(jj)    Humana HealthChicago Insurance Company, d/b/a Goldcare 65;

(kk)    HMPK, Inc.;

(ll)    HPLAN, Inc.;

(mm)   Humana Health Plan, Inc.: d/b/a (1) Central Kentucky Family Practice; (2)

Franklin Medical Center; (3) Humana Health Care Plans of Indiana; (4)

Madison Family and Industrial Medicine (KY); and (5) Humana Health

Care Plans -Somerset (KY);

(nn)    Humana Kansas City, Inc., d/b/a: (1) Humana Prime Health Plan;

(oo)    Humana Health Insurance of Nevada, Inc.;

(pp)    Humana Health Plan of Ohio, Inc., f/k/a ChoiceCare Health Plans, Inc.,

d/b/a ChoiceCare/Humana (IL, IN, KY, OH);

(qq)    Humana Insurance of Puerto Rico, Inc.;

(rr)    Humana HMO Texas, Inc.;

(ss)    Humana Health Plan of Texas, Inc., d/b/a: (1) Humana Health Plan of San Antonio; (2) Humana Regional Service Center; (3) Leon Valley Health Center; (4) Lincoln Heights Medical Center; (5) MedCentre Plaza Health Center; (6) Perrin Oaks Health Center; (7) Val Verde Health Center; (8) West Lakes Health Center; and (9) Wurzbach Family Medical Center;

(tt)    PCA Health Plans of Texas, Inc.;

(uu)    PCA Provider Organization, Inc;

(vv)    CareNetwork, Inc., d/b/a CARENETWORK;

(ww)    Humana Wisconsin Health Organization Insurance Corporation d/b/a: (1) WHOIC; and (2) WHO;

(xx)    Independent Care, Inc.;

(yy)    Network EPO, Inc.; and

(zz)    Wisconsin Employers Group, Inc.

22.    Unless otherwise specified, Humana Inc. and the Humana Health Plans as well as Humana-owned,-operated and/or -controlled entities that offer health insurance are collectively referred to herein as "Humana."

## V. DEFINITIONS

23.    As used herein, the following terms are defined as:

(A)    "Health Plan" means a plan that provides or arranges for the provision of medical and other health services and health insurance to employment groups, other affinity groups and individuals.

(B)    "Benefit Plan" means an ERISA-governed employee welfare plan offered by an employer as an employment benefit and provided in

exchange for the employee's labor, cash, and/or services.

(C)    "Humana Medical Necessity Definition" means the essential factors set forth by Humana in Health Policies, summary plan descriptions, member handbooks, certificates of coverage, other plan descriptions, notifications of modifications and changes to the plan, and other documents sent to Class Members to describe the circumstances under which Humana will provide health insurance coverage.

According to the Humana Medical Necessity Definition, services and supplies are medically necessary when they are:

1.    consistent with the symptom or diagnosis and treatment of the member's injury or sickness;

2.    appropriate with regard to standards of good medical practice;

3.    not solely for the convenience of a member, physician, hospital or ambulance care facility; and

4.    the most appropriate supply or level of service which can be safely provided to the member. When applied to the care of an inpatient, it further means that the Members' medical symptoms or condition require that the services cannot be safely provided to the member on an outpatient basis.

(D)    "Health Policy" means a contract for the provision of health insurance between an insured and Humana Inc. and/or a Humana Plan.

(E)    "Utilization Policies and Procedures" means those policies and procedures set forth in the Utilization Management Policies and Procedures Manuals approved by Defendant.

(F)    "Undisclosed Cost-Based Criteria" means criteria based in whole or in part on cost considerations, which are used by Humana to determine the medical necessity of treatment for coverage purposes, including but not limited to (i) Interqual Criteria, (ii) Milliman and Robertson Criteria, and (iii) Value Health Sciences,

39

Inc. criteria and guidelines.

(G)    "Disclosure Documents" are documents Humana has delivered or caused to be delivered to Class Members by means of the United States Postal Service concerning the amount, quality and circumstances of care and service offered by Humana Health Plans. These documents include, without limitation, (i) summary plan descriptions; (ii) certificates of coverage; (iii) other plan benefit descriptions mailed to Class Members upon or after their enrollment in a Humana Health Plan; (iv) notifications of Health Plan changes or modifications; (v) penta-annual updated summary plan descriptions.

(H)    "Participant" means (1) any person who is an employee or former employee of an employer that arranged ERISA-governed health benefits for purchase by its employees and (2) who purchased membership in a Humana Health Plan as a participant in such ERISA-governed benefit plan.

(I)    "RICO Class Members" means all persons who purchased memberships or participated in Humana Health Plans individually or as members of employment groups during the RICO Class Period.

(J)    "ERISA Class Members" means all persons whose employment group health benefit plans were governed by ERISA during the ERISA Class Period.

(K)    "Class Members" means all persons who are members of either the RICO Class or ERISA Class, or both.

(L)    "The Classes" means the RICO Class and the ERISA Class.

## VI. CLASS ACTION ALLEGATIONS

24.    Plaintiffs Regina Joi Price, Anthony Sessa, Rey Garcia, Katherine Frisco, Ramon

40

Ortiz Rosario, Emily M. Brown, Arnold Katz, Dawn Yingling and Adriana Berrios, Ailene

Colini, Robert L. Guesby, Clive D. Hayhurst, Dara R. Lewen, Maureen Lewinsohn, Donna

Messina, Sarah A. Rothman, Susan K. Smart, Alan Weinger and Cynthia Zilka bring this action

on behalf of themselves and, under Fed. R. Civ. P. 23(b)(2) and 23(b)(3), as representatives of

the RICO Class, defined as all persons who purchased or participated in Humana Health Plans

during the RICO Class Period.  The RICO Class does not include Defendant's directors, officers

and employees.  In addition, this action does not seek to remedy claims of personal injury,

medical malpractice and/or wrongful death against Defendant.

     25.    Plaintiffs Ramon Ortiz Rosario,  Katherine Frisco, Emily M. Brown, Arnold Katz

Dawn Yingling, Donna Messina, Alan Weinger and Cynthia Zilka also bring this action on

behalf of themselves and pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), as representatives of

the ERISA Class, defined as all persons who participate or have participated in an employee

welfare plan as defined in 29 U.S.C. § 1002(1) during the ERISA Class Period.  The ERISA

Class does not include Defendant's directors, officers and employees.

     26.    Class Members are numerous and joinder is impracticable.  Plaintiffs believe that

there are millions of Class Members as above-described.  Their exact number and identities is

known by the Defendant.

     27.    Plaintiffs' claims are typical of the Class Members.  Plaintiffs and Class Members

were damaged in the same way by the same wrongful conduct of Defendant.

     28.    Plaintiffs will fairly and adequately protect and represent the interests of the

Classes.  The interests of Plaintiffs are coincidental with and not antagonistic to those of the

Classes.

29.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

30.    Questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendant engaged in a pattern of wrongful conduct, by a scheme of material misrepresentations and omissions in documents provided directly and indirectly to Class Members, to fraudulently induce Plaintiffs and Class Members to enroll or remain enrolled in Humana Health Plans;

b.    Whether Defendant knowingly misrepresented to the Class Members, or knowingly permitted misrepresentations to be made on its behalf to the Class Members, that claims for coverage of medical services specified in Humana's Health Policies would be paid if the services met the Humana Medical Necessity Definition;

c.    Whether Humana based coverage determinations on Undisclosed Cost-Based Criteria that are different from or more restrictive than the factors included in the Humana Medical Necessity Definition;

d.    Whether Humana concealed from Class Members that it has established a set of direct financial incentives to claims reviewers that encourage claims reviewers to deny claims without regard to the medical needs of patients;

e.    Whether Humana fraudulently omitted to disclose to the Classes that in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Class Members' medical coverage – to third parties, who have

42

based claim approval decisions, in whole or in part, on undisclosed criteria, with the purpose of limiting the circumstances when Humana would approve treatment or claims;

   f.  Whether Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations;

   g.  Whether Humana concealed from Class Members its use of capitation arrangements with physicians.

   h.  Whether Humana retained the benefits of the above alleged practices which otherwise would have belonged to Class Members;

   i.  Whether the value of the Humana Policies as represented was more than the value of the policies as implemented; and

   j.  Whether Humana intentionally, recklessly or negligently damaged and irreparably harmed Plaintiffs and Class Members by the conduct described herein;

   31.  Questions of law and fact common to the RICO Class include, but are not limited to:

   a.  Whether Humana conducted the affairs of an enterprise through a pattern of racketeering activity as defined in RICO;

   b.  Whether Humana participated in the operation and management of both a national health care network and state and local health care networks, consisting of Humana, the Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient

centers, pharmacies, and home health agencies;

        c.      Whether the property and business of the RICO Class was directly and proximately injured within the meaning of § 1964 of RICO, as a result of Humana's racketeering activities and predicate acts consisting of a wrongful scheme intended to defraud the RICO Class, and involving use of the United States mail and interstate wire services in furtherance of that scheme to disseminate to the RICO Class advertising materials, Health Policies, benefit descriptions, claims forms, and letters misrepresenting and omitting to disclose the coverage provided by Humana policies in violation of RICO;

        d.      Whether Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, wire fraud and other unlawful means, with the purpose and goal of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana;

        e.      Whether Humana purposely induced RICO Class Members to pay for health policies that were worth less than the value of the policies described by Humana by sending though the mails a series of documents containing material omissions and misrepresentations with respect to eligibility for payment of claims;

        f.      Whether Humana is liable to RICO Class Members for treble damages for conduct actionable under the civil provisions of the RICO statute.

        32.      Questions of law and fact common to the ERISA Class include, but are not limited to:

        a.      Whether Humana's failure to operate Benefit Plans in accordance with the

representations contained in the Disclosure Documents violated § 404 of ERISA;

      b.      Whether Humana, by its use of Undisclosed Cost-Based Criteria, provided direct financial incentives to claims reviewers and engaged in the other practices described above in violation of its duty to inform ERISA Class Members of any reduction in coverage as provided by § 104(b) of ERISA and its duty to discharge its responsibilities in accordance with Plan Documents § 404 (a) (1) (D);

      c.      Whether Humana's misrepresentations respecting the Medical Necessity Definition and its failure to disclose the use of Undisclosed Cost-Based Criteria, direct financial incentives to claims reviewers, direct financial incentives to physicians, and other practices described above and detailed below, violated its fiduciary duty to ERISA Class Members;

      d.      Whether Humana violated its fiduciary duty under ERISA by failing to disclose the incentives it created that might affect the physician-patient relationship and failing to provide promised coverage-benefits and failing to administer ERISA benefit plans in accordance with plan documents.

      e.      Whether Humana is liable to ERISA Class Members for restitutionary, injunctive and other relief pursuant to §§ 104 and 404 of the ERISA statute.

33.      The above-identified common questions predominate over questions, if any, that may affect only individual Class Members.

34.      The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

45

35.     Defendant has acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

36.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of evidence, effort, and expense that numerous individual actions would require.

## VII. FACTUAL BACKGROUND COMMON TO ALL CLAIMS

A.     Humana's National Health Care Network

37.     At all relevant times, there has existed a national health care network, assembled by Defendant Humana and consisting of Humana, the Humana Health Plans, and health care providers throughout the country, including primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies, all associated through contracts as part of the health care network for the common purposes of providing medical services to Humana customers and earning profits from the provision of those services. (This national network is hereinafter referred to as the "National Enterprise").

(a)     The National Enterprise is composed of:

(i)      Humana and subsidiaries set forth in paragraph 21 above;

(ii)     the primary doctors in private practice, who are not employees of Humana

46

or its subsidiaries, but who contract with Humana or its subsidiaries to

provide primary care to Class Members through Humana's Health Plans;

(iii)    medical specialists who are not employees of Humana or its subsidiaries,

but who contract with Humana or its subsidiaries to provide care to Class

Members;

(iv)    medical laboratories that are not owned by Humana or its subsidiaries but

that contract with Humana or its subsidiaries to provide diagnosis and

other laboratory services for Humana and to Class Members;

(v)    hospitals that are not owned by Humana or its subsidiaries but that

contract with Humana to provide hospital facilities and services for

Humana and to Class Members;

(vi)    outpatient centers that are not owned by Humana or its subsidiaries but

that contract with Humana to provide outpatient services for Humana and

to Class Members;

(vii)    pharmacies that are not owned by Humana or its subsidiaries but that

contract with Humana to provide pharmaceutical services for Humana and

to Class Members; and

(viii)    home health centers that are not owned by Humana or its subsidiaries but

that contract with Humana to provide home health services for Humana

and to Class Members.

38.    The National Enterprise is centrally operated from Humana's national

headquarters in Louisville, Kentucky. The National Enterprise includes the following structural and operational features:

(a)    "Nationally, Humana has assembled one of health care's largest networks." (Humana Web Site).

(b)    "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14).

(c)    "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology.... The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality management and utilization review." (Humana Web Site.)

(d)    "Humana's Information Systems organization operates in a centralized

48

manner. Humana's data center and the majority of its programming and support staff are located at its corporate offices in Louisville, Kentucky." (Humana Web Site.)

(e)    "The Company [Defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical members. The Company's products are marketed primarily through health maintenance organizations ("HMOs") and preferred provider organizations ("PPO's") that encourage or require the use of contracted providers." (Humana 1999 10-Q (First Quarter), at 11-12).

(f)    The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(g)    The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(h)    Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

39.    The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

49

B.    The State and Local Health Care Networks

40.    At all relevant times, in each state where Humana Health Plans operate, there have existed one or more state and/or local health care networks, assembled by Humana and consisting of Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies. (These state and local health networks are hereinafter referred to as the "State and Local Enterprises".)

   (a)    Each of the Humana State and Local Enterprises is composed of:

      (i)    Humana and one or more of the Humana subsidiaries set forth in paragraph 21 above;

      (ii)    the primary doctors in private practice, who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

      (iii)    medical specialists who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide care to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

      (iv)    medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnostic and other laboratory services for Humana and to Class Members through the

50

Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(v)    hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(vi)    outpatient centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide outpatient services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(vii)    pharmacies that are not owned by Humana or its subsidiaries but that contract with Humana to provide pharmacy services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise; and

(viii)    home health centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide home health services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise.

41.    Each State and Local Enterprise is an association-in-fact operating for the common purposes of (1) providing medical services to Humana customers and (2) earning profits from the providing of those services. Each State and Local Enterprise is centrally operated from

51

Humana's national headquarters in Louisville, Kentucky. The features of the structure and operation of the State and Local Enterprises include the following:

(a)     "Nationally, Humana has assembled one of health care's largest networks. Locally, where care is delivered, our networks are as deep as they are broad, with primary doctors, specialists, lab services, hospitals, outpatient centers, pharmacies and home health agencies." (Humana Web Site).

(b)     "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14).

(c)     "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology. . . The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality

52

management and utilization review." (Humana Web Site.)

(d)    "Humana's Information Systems organization operates in a centralized

manner. Humana's data center and the majority of its programming and

support staff are located at its corporate offices in Louisville, Kentucky."

(Humana Web Site.)

(e)    "The Company [Defendant Humana] is a health services company that

facilitates the delivery of health care services through networks of

providers to its approximately 6.1 million medical Members. The

Company's products are marketed primarily through health maintenance

organizations ("HMOs") and preferred provider organizations ("PPO's")

that encourage or require the use of contracted providers." (Humana 1999

10-Q (First Quarter), at 11-12).

(f)    The administration of Humana's utilization management program is

shared among a centralized staff located in Louisville and staff located in

each market.

(g)    The Corporate Medical Affairs Department in Louisville forwards several

reports to the local markets on a monthly basis to enable them to track the

performance of individual physicians.

(h)    "The Company's subsidiaries operate in states which require certain levels

of equity and regulate the payment of dividends to the parent company."

(Humana 1999 10-Q (First Quarter) at 15.)

    (i)    Pre-admission review is a centralized operation based in Louisville,

including pre-admission certification for PPO's and pre-admission

notification for HMO's.

C.    Categories of Health Plans Offered by
       Humana to Classes Members

42.    Humana operates the following types of HMOs: (a) a classic staff model, in which

the health plan corporation employs physicians and other health care professionals on a salaried

or capitated basis; (b) a staff-network model, in which staff physicians are supplemented by

physicians who contract with the health plan to be in its network of participating physicians and

are paid negotiated fees; and (c) a mixed model. Under the "capitation"system, each physician or

group of physicians receives a fixed monthly payment per Humana patient regardless of the

amount of medical care that is provided to the patient or the patient requires. That is, under

capitation, physicians do not receive a fee for each service actually rendered. Instead, monthly

payments to physicians remain constant and must be used by the physicians to cover the cost of

the physician time and all medical costs associated with the care provided by the physician --

sometimes including hospitalization, specialists and diagnostic testing.

43.    Humana's Individual HMO Plan is a medically underwritten plan that provides

broad coverage for individuals who are under age 65 and not eligible for Medicare and are not

covered by a commercial group plan.

44.    All Humana HMOs provide a broad range of health services to covered patients.

In order to obtain covered medical services, Humana customers must choose a primary care

physician from the Plan's provider directory. The primary care physician provides, or arranges for other doctors to provide, all health care services for the member.

45.    Humana PPO plans are networks of providers that contract with Humana to provide services to Humana customers. Humana contracts with large networks of PPO physicians, hospitals and other health care professionals from whom Humana customers may seek services. Each PPO plan offers two levels of coverage, including one for services from non-participating providers. While network physicians are most commonly paid negotiated fees, increasingly such network physicians have "capitation" arrangements with Humana.

46.    Humana is also in the business of underwriting, administering and operating employee welfare plans defined in 29 U.S.C. § 1002(1) as "any plan, fund, or programs which was heretofore or is hereafter established or maintained by an employer or by an employee organizations,...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits...."

47.    A person can join a Humana Health Plan by submitting an application and enrollment form to the plan. Plan membership dues are paid on a periodic basis, and plan members have the option to renew their membership on an annual basis.

48.    At all relevant times, Class Members purchased Health Policies directly or indirectly from Humana, by means of (a) cash payments, (b) salary deductions and/or (c) labor provided as quid pro quo for the purchase of health care coverage.

D.    Disclosures by Humana to Class Members

49.    From time to time, Humana provided Class Members with descriptions or

55

certifications of the benefits provided by their Humana Health Policies. During the RICO Class

Period and the ERISA Class Period, Humana has on multiple occasions delivered or caused to be

delivered to Class Members Disclosure Documents including: (i) summary plan descriptions;

(ii) certificates of coverage; and (iii) other coverage descriptions that Humana mailed, or caused

to be mailed, to each Class Member after each Class Member became a participant in a Humana

Health Plan, (iv) notifications of modifications and changes to the plan, and (v) penta-annual

updated summary plan descriptions that Humana mailed or caused to be mailed to Class

Members and that integrated all plan amendments made within such five-year period.

50.    The Health Policies Humana sold to Class Members during the RICO Class

Period and ERISA Class Period were standard in all respects relevant to Plaintiffs' claims and

the claims of the Classes; all contained the Humana Medical Necessity Definition set forth in

paragraph 23 above. According to the Disclosure Documents, Humana Health Plans insure

specified health services where Humana determines that they satisfy the Medical Necessity

Definition set forth in paragraph 23.


E.    Humana's Fraudulent
      Omissions to the Classes


51.    Humana has fraudulently concealed from Class Members numerous practices that

have the purpose and effect of reducing the value of the Health Plans for which Class Members

paid. For example:

(a)    The Disclosure Documents failed to disclose that Humana provides direct cash

bonuses and other financial incentives to claims reviewers who deny claims for
service or limit hospital admissions and stays regardless whether those claims or
hospital admissions otherwise satisfied the Medical Necessity Definition. The
bonuses and financial incentives provided by Humana included, among other
things, a "Utilization Incentive Plan" that provided for direct bonus payments and
other benefits to claim reviewers who denied a certain percentage or absolute
number of submitted claims for hospital costs from Class Members, irrespective
whether the submitted claims satisfied the Medical Necessity Definition. These
incentives thus reduced the value of the Health Plans for which Class Members
paid.

(b)     The Disclosure Documents failed to disclose that in addition to, or in place of, the
Medical Necessity Definition, Humana uses Undisclosed Cost-Based Criteria to
approve or deny benefit claims by Class Members. These Undisclosed Cost-
Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman &
Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value
Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they
share one critical dimension: in whole or in part, they all base coverage
determinations on considerations other than medical necessity and contrary to the
terms of the Medical Necessity Definition set forth in the Disclosure Documents.
All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of
medically necessary services available to Class Members and did reduce the value

57

of the Health Plans for which Class Members paid.

(c)     The Disclosure Documents failed to disclose that Humana subcontracts to third

parties, such as Value Health Science (VHS), responsibility and authority to

review claims and manage benefits, for certain medical conditions and medical

procedures.  In determining payment eligibility for claims submitted by Class

Members, these third parties use criteria different from and more restrictive than,

the Humana Medical Necessity Definition.

(d)     The Disclosure Documents failed to disclose that in determining payment

eligibility for claims submitted by Class Members, Humana, as well as third

parties with which Humana subcontracted, used both physicians and

nonphysicians who lacked the training and specialization necessary to determine

whether particular benefits should be provided in accordance with the Humana

Medical Necessity Definition furnished to Class Members in the Disclosure

Documents.

(e)     The Disclosure Documents failed to disclose that Humana creates direct financial

incentives to treating physicians and other health care professionals to deny

coverage to individuals enrolled in Humana's Health Plans, even where the

treatment for which coverage is proposed satisfies the Humana Medical Necessity

Definition.  Among other things, Humana failed to disclose that

(i)     it enters into risk-sharing arrangements with physicians, including without

limitation so-called "capitated payment" arrangements, that provide

58

financial incentives to treating physicians for not prescribing or recommending treatment for Class Members.

(ii)    In addition, Humana failed to disclose that it contracts to use VHS's Practice Review System to analyze the clinical practice patterns of individual physicians, physician networks and health care plans in order to identify both "cost effective" physicians and physicians who utilize more than the optimal amount of health services. Network physicians are notified by Humana of undesirable practice profiles (that is, health service utilization rates) and are reminded that Humana contracts only with practitioners who provide "appropriate utilization". These notifications pressure network physicians to restrict care and prescribe medical services that satisfy criteria other than those contained in the Humana Medical Necessity Definition.

(iii)    Also, Humana engages in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary or automatic downcoding creates a disincentive for physicians to perform certain medical procedures, even when medically necessary, because they are not likely to be paid for them.

Taken together, these various undisclosed arrangements and incentives are designed to

59

influence the extent of coverage available to Class Members in a manner that is inconsistent with the Medical Necessity Definition, because such incentives were designed to make it more likely than otherwise that doctors would deny care or a level of care otherwise satisfying the criteria included in the Medical Necessity Definition.

  (f)  The purpose and effect of the fraudulent, material omissions identified in this paragraph was to reduce the value of the Health Plans for which Class Members paid below the value of the Health Plans as described in the Disclosure Documents, and thereby to benefit Humana.

  (g)  Humana knowingly and intentionally failed to disclose to Class Members all the material omissions identified in this paragraph, with the intent to hide their use and influence from Class Members.

F.  <u>Humana's Material Misrepresentations
to the Classes</u>

  52.  Having made the omissions identified in the preceding paragraph, Humana also misrepresented to the Classes in the Disclosure Documents that treatment and coverage decisions under Humana Health Plans would be based on the Medical Necessity Definition. This representation was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for administering its Health Plans) made treatment and coverage decisions on the basis of cost-based criteria and financial incentives unrelated to, and more restrictive than, the Medical Necessity Definition, with the effect of

reducing the value of the Health Plans for which Class Members paid.  For example:

(a)    Humana knowingly uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny benefit claims by Class Members.  These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science.  While these Undisclosed Cost-Based Criteria  vary in detail, they share one critical dimension: in whole or in part, they all base coverage determinations on considerations other than medical necessity and contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents.  All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medically necessary services available to Class Members and did reduce the value of the Health Plans for which Class Members paid.

(b)    Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or  limit hospital admissions and stays regardless whether those claims or hospital admissions otherwise satisfied the Medical Necessity Definition. The bonuses and financial incentives provided by Humana included, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to claim reviewers who denied a certain percentage or absolute number of submitted claims for hospital costs from Class Members, irrespective whether the submitted claims satisfied the

Medical Necessity Definition. These incentives thus reduced the value of the Health Plans for which Class Members paid.

(c)     Humana subcontracts to third parties, such as Value Health Science (VHS), responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for claims submitted by Class Members, these third parties use criteria different from and more restrictive than, the Humana Medical Necessity Definition.

(d)     In determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Disclosure Documents.

(e)     Humana creates direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, even where the treatment for which coverage is proposed satisfies the Humana Medical Necessity Definition. Among other things, Humana failed to disclose that

(i)      it enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated payment" arrangements, that provide financial incentives to treating physicians for not prescribing or

62

recommending treatment for Class Members.

(ii)    In addition, Humana failed to disclose that it contracts to use VHS's

Practice Review System to analyze the clinical practice patterns of

individual physicians, physician networks and health care plans in order to

identify both "cost effective" physicians and physicians who utilize more

than the optimal amount of health services.  Network physicians are

notified by Humana of undesirable practice profiles (that is, health service

utilization rates) and are reminded that Humana contracts only with

practitioners who provide "appropriate utilization".  These notifications

pressure network physicians to restrict care and prescribe medical services

that satisfy criteria other than those contained in the Humana Medical

Necessity Definition.

(iii)   Also, Humana engages in undisclosed automatic "downcoding" of claims

submitted by physicians, a process whereby (among other things) Humana

arbitrarily changes the benefits code assigned to rendered services so as to

reduce the payments due physicians.  Arbitrary or automatic downcoding

creates a disincentive for physicians to perform certain medical

procedures, even when medically necessary, because they are not likely to

be paid for them.

Taken together, these various undisclosed arrangements and incentives are designed to

influence the extent of coverage available to Class Members in a manner that is inconsistent with

the Medical Necessity Definition, because such incentives were designed to make it more likely than otherwise that doctors would deny care or a level of care otherwise satisfying the criteria included in the Medical Necessity Definition.

    (f)    The purpose and effect of the fraudulent representations identified in this paragraph was to reduce the value of the Health Plans for which Class Members paid below the value of the Health Plans as described in the Disclosure Documents, and thereby to benefit Humana.

    (g)    Humana knowingly and intentionally engaged in the misrepresentations identified in this paragraph, with the intent of misleading Class Members.

G.    <u>Humana Takes Actions that are Inconsistent<br>with the Interests of the Classes</u>

53.    Managed health care need not be provided in a manner that creates conflicts of interests between a managed care provider on the one hand and the plan participants on the other hand. In violation of its duties under ERISA and other legal and fiduciary obligations, however, Humana took purposeful actions that created conflicts between Humana as ERISA fiduciary and ERISA Class Members as ERISA beneficiaries. Among other things:

    (a)    Humana directly and/or indirectly employed doctors, nurses and other persons to review benefit claims submitted by Class Members and *gave express financial incentives to such claim reviewers to deny such claims or limit hospital stays regardless whether hospital stays otherwise satisfied the Humana Medical Necessity Definition included in the Disclosure Documents distributed to Class Members.* These financial incentives included, among other things, a Utilization

Incentive Plan that provided for direct bonus/payments and other benefits to claims reviewers who denied a certain percentage or absolute number of submitted hospital claims from Class Members.

(b) Humana retained outside management consultants, including without limitation Coopers & Lybrand, to make recommendations that Humana then implemented, relating to the management of Health Benefit Plans, including without limitation procedures used by Humana to determine payment eligibility for claims submitted by the Class, to review denied claims, and to determine the scope of covered benefits. In engaging these management consultants, Humana principally sought to achieve financial benefits for Humana and its shareholders by, among other things, lowering the rates of utilization of services by Class Members without regard to medical necessity, thereby reducing the value of the Health Plans to Class Members. Thus, in violation of ERISA and other legal and fiduciary obligations, Humana adopted the recommendations of outside managers and consultants to promote the interests of shareholders and Humana executives at the expense of Class Members.

(c) Humana engaged in automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. "Downcoding" creates a negative incentive for physicians with respect to performing or recommending certain medical procedures, even when medically

65

necessary, because they are not likely to be paid for them and therefore reduces the value of the health insurance benefits recieved by Class Members.

(d) Humana based coverage decisions on guidelines developed by third parties that Humana intended to reduce the level of coverage available to Class Members. By way of example only, Humana, for the express purpose of reducing patient care utilization rates without regard to medical necessity, used guidelines purchased from Milliman & Robertson. The Milliman & Robertson guidelines employ criteria that are different from and more restrictive than the Medical Necessity Definition set forth in Disclosure Documents.

(e) In connection with the management of Health Benefit Plans and the process for determining payment eligibility for claims submitted by the Class, Humana contracted with third parties, including by way of example only, Value Health Science, for the purpose of developing and using medical administration software to screen claims submitted by Class Members. Humana contracted with Value Health Science for the purpose of reducing coverage and patient care utilization rates, in order to benefit Humana, and not for the primary purpose of protecting or promoting the interests of the participants and beneficiaries. By using the services of Value Health Science, Humana created a conflict between the interests of Humana in making a profit and the interests of Class Members in obtaining coverage as represented.

(f) Humana directly and/or indirectly employed doctors as "hospitalists" to make

66

treatment as well as coverage decisions for Class Members when they were admitted for inpatient hospital services. Humana created express financial incentives to those doctors to shorten hospital stays, including specified dollar payments for each day earlier than the norm that a patient was discharged or the level of whose inpatient care was downgraded. *These incentives were provided irrespective whether the discharge or downgrade was consistent with the patient's medical necessity.*

H.     <u>Humana Operates its Network to Implement
and Promote its Wrongful Scheme</u>

54.     Humana purposefully created a centralized structure – the National Enterprise – to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Class Members. Through the National Enterprise, Humana knowingly and intentionally:

(a)     maintained centralized control over the content of the summary plan descriptions, certificates of coverage, other Disclosure Documents, plan descriptions, notifications of modifications and changes to plans, that were distributed to Class Members;

(b)     maintained centralized control over, and deceived Class Members with respect to, the existence and use of Undisclosed Cost-Based Criteria;

(c)     maintained control, implemented, and deceived Class Members with respect to claims reviewer bonuses, including without limitation, the Utilization Incentive Plan that provided for direct bonus payments and other benefits to claim reviewers who denied a certain percentage or

absolute number of submitted claims from Class Members;

(d)　maintained centralized control over, arranged for, and deceived Class

Members with respect to subcontracts to third parties, such as Value

Health Science, for the review of claims and the management of providing

benefits for certain medical conditions and medical procedures;

(e)　maintained centralized control over, and deceived Class Members with

respect to direct financial incentives to treating physicians and other health

care professionals designed to encourage denial of coverage to individuals

enrolled in Humana's Benefit Plans, irrespective whether the treatment for

which coverage was sought would satisfy the Medical Necessity

Definition disclosed by Humana.

55.　Humana purposefully created a centralized structure to carry out its fraudulent

scheme of misleading statements and material omissions in disclosures to Class Members about

operations of the State and Local Enterprises.　By making these material omissions and

misrepresentations, Humana was able to operate the National Enterprise with sufficient

participants to preserve the State and Local Enterprises, whose ability to pay dividends to the

parent company, Humana, often required state or local regulatory approval.

(a)　Humana maintained centralized control over the content of the Disclosure

Documents distributed to Class Members, and Humana knowingly and

purposefully conducted the affairs of the State and Local Enterprises

through the material omissions and misrepresentation in these documents.

68

(b)     Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Class Members of the Undisclosed Cost-Based Criteria used to determine whether to approve or deny benefit claims by Class Members, including without limitation the Interqual Criteria, the Milliman & Robertson guidelines, and guidelines and criteria developed and/or used by Value Health Science.

(c)     Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, the cash bonuses and other financial incentives provided to doctors, nurses and other persons involved in the process of approving or denying benefit claims by Class Members.   Through centralized planning and implementation, Humana developed and implemented the system of bonuses and other financial incentives, including without limitation the Utilization Incentive Plan that provided for direct bonus payments and other benefits to claim reviewers who denied a certain number of requests for coverage of medical services for Class Members.

(d)     Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, subcontracts to third parties, such as Value Health Science, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

69

     (e)     Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Class Members of, direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, regardless whether the treatment would satisfy the Humana Medical Necessity Definition disclosed by Humana.

I.    <u>Harm to the Classes</u>

56.    By means of this wrongful conduct, Humana intended to and did provide to Class Members coverage of lesser value than the coverage represented to Class Members. Humana intended to retain, and did retain, the difference between the value of the coverage described in the Disclosure Documents and the value of the coverage actually provided to Class Members. Humana's wrongful conduct directly and proximately injured each Class Member in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Disclosure Documents and the coverage actually provided to Class Member.

57.    Under the terms of their Humana Health Plans, Class Members were entitled to receive coverage for services consistent with the Humana Medical Necessity Definition. This coverage was of value to Class Members and was purchased by them, directly or indirectly, with their cash, salaries, and personal services. Class Members paid for and were entitled to the coverage whether or not they ever submitted claims for medical losses.

58.    As a result of the application of Undisclosed Cost-Based Criteria to claims for services submitted by Class Members, and the other conduct and practices described above, the

coverage actually provided to all Class Members under their Plans was, in fact, coverage that was different from the coverage that was to be provided under the Humana Medical Necessity Definition set forth in Disclosure Documents distributed to Members of the Class. Through the application of the Undisclosed Cost-Based Criteria, Undisclosed Cash Incentives and the other conduct and practices described above, Humana denied all Class Members the coverage they had purchased and that was due to them under the terms of their Benefit Plans.

59.     The value of the coverage purchased by all Class Members, defined by the Humana Medical Necessity Definition and due under the terms of their Humana Health Plans, was greater than the value of the coverage actually provided by Defendant Humana. Each Class Member was thus denied and deprived of the value of the coverage defined in the Health Policies and was thereby damaged in an amount to be determined at trial, equal to the difference between the value of the coverage purchased and the value of the coverage actually provided.

## VIII. COUNT ONE

### Violation of RICO, 18 U.S.C. § 1961 et seq.
(Applicable to RICO Class Members)

60.     Plaintiffs, on behalf of themselves and the RICO Class, incorporate by reference all preceding paragraphs as if fully set forth herein.

A.     Overview of RICO Claim

61.     For the reasons stated in the preceding paragraphs and for the reasons set forth below, Defendant Humana engaged in unlawful conduct in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and in particular 18 U.S.C. § 1962(c). Defendant Humana is the sole wrongdoer alleged herein to have violated

RICO.

62.     Defendant Humana is liable under 18 U.S.C. § 1962(c) for conducting the affairs

of an enterprise through a pattern of racketeering activity.

> (a)     Specifically, and as described in more detail above, Humana participated in the
>
> operation and management of both a national health care network, and state and
>
> local health care networks, consisting of Humana, the Humana Health Plans,
>
> primary doctors, medical specialists, medical laboratories, hospitals, outpatient
>
> centers, pharmacies and home health agencies.  The participants in each of the
>
> national, state and local health care networks were associated in fact for the
>
> common purposes of providing medical services to Humana customers and
>
> earning profits from providing those services and each network thus was an
>
> enterprise with the meaning of RICO.
>
> (b)     As also described in more detail above, Humana engaged in an open-ended
>
> pattern of racketeering activity involving multiple acts of mail fraud, with the
>
> purpose and goal of fraudulently inducing the maximum number of persons to
>
> subscribe to Humana Health Plans for the benefit of Humana.

63.     Plaintiffs and RICO Class Members were the victims of Humana's wrongful

conduct.  As set forth above, RICO Class Members were induced by a series of fraudulent

statements and omissions to subscribe to health care policies offered by Humana, that were worth

less than the value of the policies described by Humana in the fraudulent statements.

64.     By means of this wrongful conduct, Humana intended to and did provide to the

RICO Class Members coverage of lesser value than the coverage represented to RICO Class Members. Humana intended to retain, and did retain, the difference in value between the coverage described in the Summary Plans and other Disclosure Documents and the coverage actually provided to RICO Class Members. Humana's wrongful conduct directly and proximately injured each member of the RICO Class in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Summary Plans and other Disclosure Documents and the coverage actually provided to RICO Class Members.

B.      Pattern of Racketeering Activity

65.     Defendant Humana has engaged in an open-ended pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), involving multiple predicate acts of mail fraud (18 U.S.C. §§ 1341 and 1342), with the purpose and goal of fraudulently inducing persons to join Humana Plans, thereby permitting Humana to enrich itself unjustly by providing coverage of lesser value than that offered to induce persons to join the Plans.

(a)     Since August 1995, Humana has repeatedly delivered or caused to be delivered to RICO Class Members, by means of the United States Postal Service, documents containing material misrepresentations and omissions concerning its determination of coverage of claims submitted by Class Members and the amount, quality and circumstances of covered care and services actually offered by Humana Health Plans.

(b)     As alleged above, these documents include (i) the summary plan descriptions, (ii) the certificates of coverage, and (iii) other plan descriptions that Humana mailed,

73

or caused to be mailed, to each member of the RICO Class after each RICO Class member became a participant in a Humana Health Plan. The documents also include (iv) the notifications that Humana mailed or caused to be mailed to RICO Class Members setting forth modifications and changes to the plan, as well as (v) the penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to RICO Class Members and that integrated all plan amendments made within such five-year period.

(c)     As set forth in detail in paragraph 52 above, the above-referenced Disclosure Documents contained material misrepresentations.

   (i)     Specifically, the Disclosure Documents represent that coverage determinations under Humana Health Plans will be made in accord with the Humana Medical Necessity Definition. The Disclosure Documents failed to disclose that Humana and those to whom Humana delegated responsibility for administering its Health Plans made treatment and coverage decisions on the basis of cost-based criteria unrelated to, and more restrictive than, the Medical Necessity Definition

   (ii)     For example, and without limitation, the Medical Necessity Definition was a willful misrepresentation in that Humana knowingly uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny claims for medical services by Class Members. These Undisclosed Cost-Based Criteria include, without

limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base treatment and coverage determinations on non-medical considerations, contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medical services available to RICO Class Members and did reduce the value of the Health Plans for which RICO Class Members paid.

    (iii)    Humana's representation in various Disclosure Documents that coverage determinations would be based on the Medical Necessity Definition was therefore false, inaccurate and misleading. Humana used additional, more restrictive undisclosed criteria to make coverage decisions, with the purpose of refusing to cover medically necessary services and the effect of reducing the value of the health coverage provided to RICO Class Members.

    (d)    Also as set forth in detail above, Humana knowingly and intentionally concealed material information from RICO Class Members including, among other things, that:

    (i)    Humana provides cash bonuses and other financial incentives to doctors,

75

nurses and other persons involved in the process of approving or denying claims for medical services by RICO Class Members, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates regardless whether those services would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans and other Disclosure Documents furnished to RICO Class Members.

(ii)     Humana uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny benefit claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base treatment and coverage determinations on non-medical considerations, contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medical services available to RICO Class Members and did reduce the value of the Health Plans for which RICO Class Members paid.

(iii)     Humana subcontracts to third parties, such as Value Health Science, the

76

review of claims, and the management of the utilization of medical services for certain medical conditions.

(iv)    In determining payment eligibility for claims submitted by RICO Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the medical training and specialization to determine whether particular medical services should be covered in accordance with the Humana Medical Necessity Definition furnished to RICO Class Members in the Disclosure Documents.

(v)    Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, regardless whether the medical services satisfy the Humana Medical Necessity Definition disclosed in Humana's Summary Plans and other Disclosure Documents.

66.    Defendant maintained a continuing pattern of racketeering activities within the meaning of 18 U.S.C. §1961(5), described above, consisting of knowingly misrepresenting and selling coverage for medical services under Health Policies provided to RICO Class Members; fraudulently failing to disclose material information, and secretly administering such Health Plans with intent to defraud Plaintiff RICO Class Members, all in violation of 18 U.S.C. §§ 1341 - 43, over a number of years during the RICO Class Period. These activities amounted to a common course of conduct to deceive RICO Class Members, by means of uniform written

misrepresentations and omissions, respecting the type and extent of their coverage under their

Humana Health Plans. Humana's wrongful acts all had the same pattern and similar purpose of

defrauding RICO Class Members for the benefit of Humana. Each such act of racketeering

activity was related, had similar purposes, involved the same or similar participants and methods

of commission, and had similar results affecting similar victims, including Plaintiffs and the

RICO Class. Such activities are part of Defendant's ongoing way of doing business and

constitute a continuing threat to the property of the RICO Class.

C.    The Enterprise

    (1) The National Enterprise

67.    As described in detail in paragraphs above, at all relevant times, there existed a

national health care network, assembled by defendant Humana and consisting of Humana, the

Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals,

outpatient centers, pharmacies and home health agencies, all associated in fact as part of the

health care network with common purposes of providing medical services to Humana customers

and earning profits from the providing of those services.

68.    The National Enterprise is an association-in-fact operating for the common

purposes of: (1) providing health insurance coverage and medical services to Humana customers;

and (2) earning profits from the providing of those services. The National Enterprise is centrally

operated from Humana's national headquarters in Louisville, Kentucky. The features of the

structure and operation of the National Enterprise are described in detail at paragraphs 37-39

above.

69.    In violation of 18 U.S.C. §1962(c), Defendant, during the RICO Class Period, conducted and participated in the conduct of the affairs of the National Enterprise through the ongoing pattern of racketeering activity described in paragraphs 37-39 above.  Defendant promoted, sold and implemented the Humana Health Policies through mail fraud as described above, with the purpose of maximizing the profits to be earned from premium and other payments made by RICO Class Members, directly or indirectly, to Humana.

70.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to RICO Class Members through the operations of the National Enterprise.  By making these material omissions and misrepresentations, Humana induced increased participation in the National Enterprise and enhanced the financial position of the National Enterprise.  See paragraphs 37-39 above.

(2)   The State and Local Enterprises

71.    As detailed in paragraphs 40-41 above, at all relevant times, in each state where Humana Health Plans operate, there existed one or more state and/or local health care networks, assembled by Humana, and consisting of Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

72.    Each State and Local Enterprise is an association-in-fact operating for the common purposes of (1) providing health insurance coverage and medical services to Humana customers; and (2) earning profits from the providing of those services.  Each State and Local Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky.

79

The features of the structure and operation of the State and Local Enterprises are described in detail above at paragraphs 40-41.

73.    In violation of 18 U.S.C. § 1962(c), Defendant, during the RICO Class Period, conducted and participated in the conduct of the affairs of the State and Local Enterprises through the ongoing pattern of racketeering activity described in paragraphs 40-41 above. Defendant promoted, sold and implemented the Humana Health Policies through mail fraud as described above, with the purpose of maximizing the profits to be earned from premium and other payments made by RICO Class Members, directly or indirectly, to Humana.

74.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to RICO Class Members of the operations of the State and Local Enterprises.   By making these material omissions and misrepresentations, Humana induced increased participation in the National Enterprise with sufficient participants and thereby enhanced to financial position of the State and Local Enterprises, whose ability to pay dividends to the parent company, Humana, often required state or local regulatory approval.

75.    As set forth above, Defendant Humana is one of the entities participating in the association-in-fact that constitutes  the National Enterprise and the State and Local Enterprises, but Defendant Humana is different from the National Enterprise and the State and Local Enterprises.  As set forth above, Defendant Humana is the perpetrator of the pattern of racketeering activity through which it conducted and participated in the conduct of the affairs of the National Enterprise and of the State and Local Enterprises.

80

D.   Relationship between the Pattern of
     Racketeering Activity and the Enterprise

76.     The pattern of racketeering activity alleged herein and the enterprise alleged

herein are separate from each other.  Humana engaged in the pattern of racketeering activity

alleged herein for the purpose of conducting the affairs of the alleged enterprise, a national health

care network, and state and local health care networks, consisting of Humana, the Humana

Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient

centers, pharmacies and home health agencies.

77.     The participants in each of the national, state and local health care networks were

associated in fact for the common purposes of providing health insurance coverage and medical

services to Humana customers and earning profits from the providing of those services.

E.  Reliance of the Class

78.    As Humana knew they would, RICO Class Members reasonably relied on the

accuracy, completeness and integrity of Humana's disclosures, with the result that they

purchased health policies and continue to enroll in Humana Health Plans.  Had Plaintiffs and

RICO Class Members known of existence of Undisclosed Cost-Based Criteria, Undisclosed

Denial Incentives, use of third party contractors to perform claims review, incentives to

physicians and others to deny claims, and the other practices and incentives designed to reduce

the value of their coverage, they would have taken corrective measures, including but not limited

to withdrawing from their Humana Health Plans or requesting that their employer provide Health

Plan alternatives other than Humana.

79.     Humana's misrepresentations and omissions in various Disclosure Documents

described above were a proximate cause of the injuries suffered by RICO Class Members. By reason of Humana's pattern of fraudulent conduct, RICO Class Members paid for the coverage consistent with the terms of the Disclosure Documents, but received less valuable coverage.

80.    As an insurer and party to an insurance transaction with RICO Class Members, Humana had a duty to disclose material information and to refrain from material misrepresentations. Class Members relied on this special relationship in accepting the completeness and accuracy of Humana's disclosures.

81.    Humana acted as a fiduciary in respect to those RICO Class Members who were also members of the ERISA Class. Humana therefore had a heightened duty to these RICO Class Members, who relied on the completeness of Humana's representations. In reliance on this fiduciary relationship, moreover, RICO Class Members who were also members of the ERISA Class relied to their detriment on the material misrepresentations contained in the Disclosure Documents.

F.  Benefits of Racketeering Activity

82.    Defendant Humana benefitted from its pattern of wrongful conduct by using the proceeds of that conduct to earn profits, to maintain control over the National Enterprise and the State and Local Enterprises, and to sustain the solvency of the National Enterprise, the State and Local Enterprises, and of Humana itself. Through its pattern of racketeering activity, Humana was able to cause RICO Class Members to pay, directly or indirectly, periodic fees for medical coverage. As a result of this wrongful conduct, Humana unjustly retained the difference between the value of the coverage promised to the RICO Class in Health Policies purchased by RICO

Class Members and the value of the coverage actually provided to RICO Class Members, in an amount to be determined at trial.

G.    Effects on Interstate Commerce

83.    Each of the Plaintiffs and RICO Class Members, and the Defendant Humana, are "persons" within the meaning of 18 U.S.C. § 1963.

84.    Defendant Humana operates a national interstate health network, with 95% of Humana's membership in 15 states – Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming – and Puerto Rico. Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above) Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas. Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million persons annually. Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

85.    The practices alleged herein involve the conduct of, and affect, interstate commerce, and involve assets and revenues in excess of hundreds of millions of dollars annually, in an amount to be determined at trial. The pattern of racketeering activity alleged herein is within the flow of, and substantially affects, interstate commerce.

H.    Direct Injury and Damages

86.     Plaintiffs and RICO Class Members paid periodic fees that reflected the value of coverage represented, rather than the actual value of the coverage, directly or indirectly, to Defendant Humana.   As a direct and proximate result of the practices described above, Humana unjustly retained the difference between the value of the coverage promised to the RICO Class in Health Policies and purchased by RICO Class Members, and the value of the coverage actually provided to RICO Class Members.   These damages are of an amount to be determined at trial.

87.     As a direct and proximate result of Defendant's violations of 18 U.S.C. §1962(c), Plaintiffs and the RICO Class have been injured in their business or property. The business and property of the Plaintiff RICO Class was directly and proximately injured as a result of Defendant's racketeering activities, as described above, in that but for Defendant's fraudulent conduct, racketeering activities and knowing misrepresentation of the coverage actually provided by Health Policies, Plaintiff RICO Class Members would not have paid as much for their Health Policies as, in fact, they paid in cash, salary deductions and labor.  Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action on behalf of the RICO Class, and Plaintiffs and the RICO Class are entitled to recover herein actual and treble damages, the costs of bringing this suit and attorneys' fees.

88.     Defendant's use or investment of racketeering income or the proceeds thereof to acquire interests in or to operate the aforementioned enterprises injured RICO Class Members in their business and property in that the Defendant operated the aforementioned enterprises for the purpose and with the effect of: (a) promoting, selling and implementing RICO Class Members' Health Policies under the false representation that the coverage of medically necessary treatment

described in the Health Policies was the same as the coverage of medically necessary treatment actually provided through use of the Undisclosed Cost-Based Criteria, and (b) inducing Class Members to pay more than the fair value for the insurance coverage actually provided under their policies as administered by Defendant.

89.     The property of which RICO Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid, directly and indirectly, by Class Members in cash, salary deductions and labor for the Health Policy as represented by Defendant and the fair value of the coverage Plaintiffs actually were provided by under the Health Policies as administered by Defendant, in an amount to be determined at trial.

## IX. COUNT TWO

Breach of Disclosure
Obligations Under ERISA
(Applicable to Members of the ERISA Class)

90.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

91.     ERISA requires that each participant covered by an employee benefit plan be furnished a summary plan description written in a manner calculated to be understood by the average plan participant, sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan and containing, among other things, information regarding: whether a health insurance issuer is responsible for the financing or

administration of the plan; the plan's requirements respecting eligibility for participation and benefits; and circumstances which may result in disqualification, ineligibility or denial or loss of benefits. ERISA, §§ 102(a)(1) and (b), 104, 29 U.S.C. §§ 1021, 1022, 1024(b). In addition, section 104(b) as amended requires that a summary description of any reductions in covered services must be provided to participants and beneficiaries within 60 days after the changes are adopted.

92.    As an ERISA fiduciary administering, managing and controlling the Health Benefit Plans of the ERISA Class, acting under the authority vested in it by plan sponsors, Humana failed to satisfy the requirements of ERISA 29 U.S.C. §§ 1022-24 because Humana failed to disclose in Disclosure Documents, written and provided by Humana to ERISA participants and beneficiaries, the Benefit Plans' requirements respecting the rights of participants and beneficiaries under the Benefit Plans; eligibility for participation and benefits; the circumstances which may result in disqualification, ineligibility or denial or loss of benefits; and the source of financing of the Benefit Plans and the identity of any organization through which benefits are provided. Because Humana failed to make these disclosures, the Members of the ERISA Class could not know exactly where they stood with respect to the Benefit Plans.

93.    By way of example only, in violation of §§ 102 and 104 of ERISA, 29 U.S.C. §§1022 and 1024, Humana, as detailed above, failed to disclose to ERISA Class Members that, among other things:

(a)    Humana applies Undisclosed Cost-Based Criteria, using factors different from and more restrictive than those described in the Humana Medical Necessity

Definition, to determine whether to approve or deny claims submitted by ERISA Class Members;

(b)     Humana provides cash bonuses and other financial incentives to doctors, nurses and other persons involved in the process of approving or denying claims of Members of the ERISA Class, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates even for services that would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans and other Disclosure Documents furnished to ERISA Class Members.

(c)     Humana subcontracts to third parties, such as Value Health Science, the review of claims and the management of the utilization of services for certain medical conditions.

(d)     In determining payment eligibility for claims submitted by ERISA Class Members, Humana, as well as third parties with which Humana subcontracted, used both  physicians and non-physicians who lacked the training and specialization necessary to determine whether coverage for services should be provided in accordance with the Humana Medical Necessity Definition furnished to ERISA Class Members in the Disclosure Documents.

(e)     Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, regardless whether the medical services satisfy the Humana

87

Medical Necessity Definition disclosed in Humana's Disclosure Documents.

94.    By failing to notify ERISA Class Members from time to time when coverage was reduced through the application of Undisclosed Cost-Based Criteria and other means, Defendant violated § 104(b) of ERISA requiring such notification within 60 days of the effective date of such reductions.

95.    Under § 502 of ERISA, 29 U.S.C. § 1132(a)(3) (B), ERISA Class Members are entitled to appropriate equitable relief including restitutionary and injunctive relief to redress the violations set forth above of the reporting and disclosure requirements set forth § 104 of ERISA.

## X. COUNT THREE

### Breach of Fiduciary Duty Under ERISA.
(Applicable to Members of the ERISA Class)

96.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

97.    At all relevant times, Defendant Humana was a fiduciary under ERISA.

A.    The Duty of Loyalty- ERISA Section 104(a)(1)

98.    By virtue of the conduct described above, Humana breached its fiduciary obligations under § 404 (a)(1) of ERISA, 29 U.S.C. §1104(a)(1), to discharge its duties with respect to the Humana Benefit Plan s "solely in the interest" of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

99.    Humana's duty of loyalty under ERISA includes the obligation to deal fairly and

honestly with all Plan Members; to refrain from material misrepresentations in respect to the level of coverage; and to communicate material facts which risk to affect adversely a plan member's interests.

100.    While managed health care need not be provided in a manner that creates a conflict of interest between an ERISA fiduciary and beneficiaries, Humana took purposeful actions, described in detail above, that created a conflict of interest between Humana, as fiduciary, and ERISA Class Members as beneficiaries, thereby breaching its duty of loyalty.

101.    Humana has also breached its duty of loyalty by failing to disclose to ERISA Class Members that Humana used Undisclosed Cost-Based Criteria and direct financial incentives to claims reviewers, by failing to disclose that Humana contracted with third parties to screen claims by ERISA Class Members, by failing to disclose that Humana provided incentives for physicians that are intended to reduce the amount or level of care provided, and by employing "hospitalists" to make treatment and coverage recommendations for inpatient services subject to express financial incentives to shorten hospital stays and that Humana engaged in the other practices described in paragraph 93.

102.    The incentives and practices described in the preceding paragraph are material information which ERISA requires Humana to disclose to ERISA Class Members.

103.    By failing to disclose this material information, Humana breached its fiduciary duty to ERISA Class Members.

B.    Duty to Discharge Responsibilities in Accordance with
       Plan Documents -- Section 404(a)(1)(D) of ERISA

104.    By failing to use the Humana Medical Necessity Definition and appropriate

89

criteria to evaluate the medical necessity of ERISA Class Members' claims for medical services, Defendants failed to carry out the terms of ERISA Class Members' Benefit Plans as implemented through Humana Plans and Policies and the benefit descriptions provided to employees, and thereby violated the duty to discharge responsibilities in accordance with plan documents pursuant to ERISA § 404(a)(1)(D), 29 U.S.C.§ 1104(a)(1)(D).

C.    Duty to Discharge Duties With Care, Skill and Prudence. - Section 404(a)(1)(B)

105.    By managing, operating and administering ERISA-governed Benefit Plans insured by Humana Health Policies in the manner described above, including the failure to disclose the use of Undisclosed Cost-Based Criteria and direct financial incentives to claims reviewers to influence claims review decisions, Defendants failed to exercise the care of an ordinarily prudent person engaged in a similar activity under prevailing circumstances, all in violation of ERISA § 404(a)(1)(B); 29 U.S.C.§1104 (a)(1)(B).

D.    Unjust Enrichment

106.    Defendant breached its fiduciary duty by materially misleading Plaintiffs and the ERISA Class to whom the duties of candor, loyalty and prudence were owed, reaped the benefits of that deception by receiving unearned premium revenues from the Plaintiffs and the ERISA Class and unjustly retained that enrichment.

107.    By evaluating the medical necessity of medical services in accordance with the Undisclosed Cost-Based Criteria, by creating and implementing direct financial incentives to claims reviewers, by creating and implementing direct financial incentives to physicians and other health care professionals to deny coverage for medical services, and by the other practices

detailed above, Defendants intended to and did provide coverage of lesser value than that represented to and purchased by ERISA Class Members. Defendants intended to retain and did retain the difference in value between the coverage described in Health Policies promised to and purchased by the ERISA Class and the coverage actually provided to the ERISA Class. Defendant thus fraudulently implemented the Health Policies for the benefit of Defendant and not for the benefit of ERISA Class Members.

108.    As participants in ERISA-governed Health Benefit Plans, Plaintiffs and the ERISA Class are entitled to appropriate equitable relief under section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3) to (a) redress the violations of section 404 of ERISA, 29 U.S.C. §1104, set forth herein, and (b) recover the amounts by which Humana has been unjustly enriched as a result of such violations.

109.    As participants in ERISA-governed Health Benefit Plans Plaintiffs and the ERISA Class are entitled appropriate relief under § 502(a)(2) of ERISA, 29 U.S.C.§1132(a)(2), including recovery of unjust enrichment, to redress violations of section 409 of ERISA, 29 U.S.C. §1109, to make good to such Plans any losses to the Plan resulting from each breach of fiduciary duty imposed by ERISA.

### XI.   COUNT FOUR

#### Failure to Provide Benefits Due Under ERISA Plans
(Applicable to Members of the ERISA Class)

110.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

111.    Under the terms of their Benefit Plans, ERISA Class Members were entitled to a

benefit consisting of coverage for Services described in the Humana Medical Necessity Definition. This coverage-benefit is distinct from individual claims for the payment of the medical losses incurred by ERISA Class Members. This coverage-benefit was of value to ERISA Class Members and was purchased by them, directly or indirectly, with their cash, salaries, and personal services. ERISA Class Members paid for the coverage-benefit whether or not they ever submitted claims for medical losses.

112.    As a result of the conduct and practices described in detail above, the coverage actually provided all ERISA Class Members under their Plans was different from the coverage indicated under the Humana Medical Necessity Definition set forth in the Disclosure Documents distributed to Members of the ERISA Class. ERISA Class Members purchased an ERISA-governed benefit – coverage for medically necessary services as described and defined in Humana Health Policies – which they were due under the terms of their Benefit Plans. Through the consistent and exclusive application of Undisclosed Cost-Based Criteria and the other conduct and practices described above, Humana denied all ERISA Class Members the coverage they had purchased and that was due under the terms of their Benefit Plans.

113.    Pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), ERISA Class Members are entitled to recover benefits due to them under the terms of their Plans and can enforce their rights under the terms of their Plans. The ERISA Class in this action is entitled to restitution of past coverage-benefits payments in an amount, to be determined at trial, equal to the difference between the value of the coverage-benefit purchased and the value of the coverage-benefit actually provided.

## XII.  COUNT FIVE
### Breach of Fiduciary Duty by Failure to
### Disclose Incentives Imposed on Physicians
(Applicable to Members of the ERISA Class)

114.    In violation of its fiduciary duty to ERISA Class Members under §404 of ERISA,

Humana has failed to disclose the financial incentives it provides to physicians that are intended

to induce physicians to limit the amount of care they provide to their patients in Humana plans.

115.    Unbeknownst to ERISA Class Members, Humana has created payment

arrangements and direct financial incentives to treating physicians that encourage physicians to

deny coverage to ERISA Class Members; to withhold medical services from ERISA Class

Members; and to advise ERISA Class Members not to receive or seek medical services.  These

arrangements and incentives -- which were never disclosed to ERISA Class Members -- include,

without limitation, "capitated payment" arrangements and "downcoding" practices.  These

incentives apply irrespective whether the medical services to be denied or withheld were

medically advisable or consistent with the Medical Necessity Definition.

116.    The existence of these financial incentives is material information. ERISA Class

Members rely on physician advice with respect to treatment options.  Because trust and openness

are at the heart of the physician-patient relationship, patients have an interest in knowing whether

any external financial incentives may apply to their physicians' advice.

117.    By failing to disclose this material information, Humana breached its fiduciary

duty to ERISA Class Members.

118.    As participants and beneficiaries of ERISA-governed Health Benefit Plans,

Plaintiffs and the ERISA Class are entitled to restitutionary, injunctive and other appropriate

equitable relief pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

## XIII. DEMAND FOR JURY TRIAL

119.    Plaintiffs demand a trial by jury on behalf of themselves and the Class.

WHEREFORE, plaintiffs, on behalf of the Classes, pray for judgment as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and that plaintiffs are proper representatives of the Classes;

b.    Awarding RICO Plaintiffs and RICO Class Members treble damages as a result of the wrongs alleged in the complaint;

c.    Awarding ERISA Plaintiffs and ERISA Class Members restitutionary relief for the wrongs alleged in the complaint;

d.    Awarding ERISA Plaintiffs and ERISA Class Members injunctive relief barring Humana from continuing the misrepresentations and omissions described herein;

e.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

f.  Awarding Plaintiffs and Class Members their costs and expenses in this litigation,

including reasonable attorneys' fees and expert fees;

g.  Award Plaintiffs and other Class Members such other and further relief as may be

just and proper under the circumstances.

Dated:    March 28, 2000

Respectfully submitted,

*Stephen R. Neuwirth*

David Boies
Stephen Neuwirth

Michael D. Hausfeld
Joseph M. Sellers
Margaret G. Farrell
Donna Solen
COHEN, MILSTEIN,
    HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
(202) 408-4600
Fax: (202) 408-4699

David Boies
Stephen Neuwirth
BOIES, SCHILLER & FLEXNER LLP
80 Business Park Drive
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810

Theodore J. Leopold
RICCI, HUBBARD, LEOPOLD,
    FRANKEL & FARMER PA
Mellon United National Bank Tower
1645 Palm Beach Lakes Boulevard
P.O. Box 2946
West Palm Beach, Florida 33402
(561) 684-6500
Fax: (561) 697-2383

Anne E. Hinds
Florida Bar No. 0964972
BOIES, SCHILLER & FLEXNER LLP
2435 Hollywood Boulevard
Hollywood, Florida 33020-6629
(954) 929-1190
Fax:  (954) 929-1185

95

Albert R. Huerta
HUERTA, HASTINGS & ALLISON
920 Leopard
P.O. Box 23080
Corpus Christi, Texas 78403
(361) 884-1632
Fax:(361) 883-9092

H. Laddie Montague, Jr.
Jerome M. Marcus
Jonathan Auerbach
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
(215) 875-3000
Fax: (215) 875-4604

Andrew B. Peretz
Florida Bar No. 938599-ABP6646
BARRETT GRAVANTE
    CARPINELLO & STERN
One East Broward Blvd., Suite 620
Ft. Lauderdale, FL 33301
(954) 356-0011
Fax: (954) 356-0022

Michael Straus
BAINBRIDGE & STRAUS, L.L.P.
2210 Second Avenue North
Birmingham, AL 35203
(205) 324-3800
Fax: (205) 324-3996

Richard B. Drubel
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
(603) 643-9090
Fax: (603) 643-9010

James Fox Miller, Florida Bar No. 095070
Charles Fox Miller, Florida Bar No. 0970270
Greg A. Lewen, Florida Bar No. 0047422
MILLER, SCHWARTZ & MILLER, P.A.
2435 Hollywood Blvd
Hollywood, FL 33020
(954) 924-0300
Fax: (954) 924-0311

James W. Beasley, Jr.,
BEASLEY LEACOCK & HAUSER P.A.
Flagler Center, Suite 1400
505 S. Flagler Drive
West Palm Beach, FL 33401
(561) 835-0900
Fax: (561) 835-0939

David Krathen, Florida Bar No. 147810
LAW OFFICES OF DAVID KRATHEN P.A.
888 East Las Olas Blvd.
Suite 200
Ft. Lauderdale, FL 33301
(954) 467-6400

Of Counsel:
Robert Silver
Kent K. Anker
BOIES, SCHILLER & FLEXNER LLP
80 Business Park Drive
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810